OPINION OF THE COURT
David O. Boehm, J.
This motion for summary judgment brought by the defendant, Tire and Rim Association (TRA), presents a novel question as to what duty, if any, a manufacturers’ trade association owes the general public for injuries caused by the product of a member manufacturer.
The plaintiff, Linda L. Beasock, brought this action against the TRA for the wrongful death and conscious pain and *26 suffering of her husband, Anthony J. Beasock. Mr. Beasock was injured on November 29, 1977 while attempting to inflate a 16-inch truck tire mistakenly mounted on a 16.5-inch rim, using a service station air pump when the tire exploded. Mr. Beasock died on April 22,1979 as a result of those injuries.
The 16-inch tire in question was manufactured by the General Tire and Rubber Company (General Tire) in 1975 and was later recapped by Johnny Antonelli Tire Company, Inc. in 1977. On the day the deceased was injured, his employer had manually mounted the tire on a 16.5-inch rim, manufactured by Kelsey-Hayes Company in 1977, and this uninflated tire-rim assembly was taken by the deceased to a gas station for inflation.
The complaint alleges that the design of the 16.5-inch rim is defective in that it permits the mounting of a 16-inch tire without difficulty and that when inflation of this mismatched combination is attempted, the tire bead will not seat against the rim flange but instead will break with explosive force. Although the diameter of a 16.5-inch rim immediately inside the flange is approximately one-half inch greater than the same portion of a 16-inch rim, the over-all diameter of the 16.5-inch rim is in fact slightly smaller than the over-all diameter of a 16-inch rim. Thus, the effort required to slip a 16-inch tire onto a 16.5-inch rim is equivalent to the effort required to slip it onto its corresponding 16-inch rim.
The complaint further alleges that the tire and rim were defective in that they did not contain warnings concerning the danger of explosion if a 16-inch tire was mounted on a 16.5-inch rim. Lastly, it is alleged that the size markings on the tire and rim were inadequate and confusing.
The plaintiff asserts three causes of action against the TRA; for strict products liability, for breach of warranty and for negligence. The plaintiff’s claims against TRA, as alleged in the complaint and amplified in the bill of particulars, are that the defective design was approved, adopted, promulgated and perpetuated by TRA; that TRA continued to indorse and promulgate the design even after it knew that the mismatch was occurring and resulting in injuries; that the size designation of tires and rims was established by TRA; and that the few warnings issued by TRA were inadequate.
TRA is now moving for summary judgment dismissing plaintiff’s claims against it for failure to state a cause of action and for lack of personal jurisdiction. This is the second *27 motion brought before this court by TRA. Previously, in 1981, TRA moved to dismiss for lack of personal jurisdiction. This motion was denied without prejudice in order to permit the plaintiff to conduct discovery on the issue of jurisdiction.
TRA is an Ohio not-for-profit corporation located at Fair-lawn, Ohio. It was founded in 1903 and incorporated in its present form in 1933. It has three employees, J. F. Pacuit, who is its executive vice-president, and two staff members, a bookkeeper/secretary and a clerk/typist.
The primary function of TRA is to promote dimensional standards within the automotive industry for tires and rims to allow interchangeability among the various manufacturers’ products. The 1933 articles of incorporation state that its purpose is to "promote the interests of the Automotive Industry as relating to tires, rims, wheels and their component parts; to establish sound engineering standards for the guidance of the tire, rim and wheel industries; to provide inspection for the maintenance of such standards among the members of the Association; and to do everything necessary, suitable and proper, including cooperation with all branches of the Automotive Industry, for the accomplishment of any of the aforesaid objects”. The association’s purposes are also similarly set forth in its constitution and regulations.
All manufacturers of tires, rims and related components are eligible for TRA membership, and in 1980 its membership consisted of 43 domestic and 83 foreign manufacturers. Both General Tire and Kelsey-Hayes are members.
Since 1923 all TRA standards have been published annually in the TRA yearbook. The yearbook contains primarily dimensional standards for tires, rims and associated parts as well as recommended pressures and load ratings for tires. The dimensional standards include rim contours or cross sections of the rims which graphically display the shape of the rim in addition to its various dimensions.
TRA has some 12 to 15 committees and subcommittees, all of which are involved with the contents of the yearbook and the TRA Engineering Design Information (EDI). Both General Tire and Kelsey-Hayes, in addition to having representatives on the board of trustees of TRA, also have representatives on the Standards and Technical Advisory Committees, as well as the Passenger Car, Truck-Bus, Off-the-Road, Agricultural and Industrial, Tire and Rim Standards Subcommittees. The EDI, published by TRA since 1969, is a supplement to the yearbook *28 and is revised quarterly. It contains standards for new tires and rims or so-called design guide status standards. Eventually, should the appropriate committees and subcommittees believe these proposed standards are acceptable, their status would change to a TRA standard and would be published in the yearbook.
TRA denies that it engaged in the design, sale, manufacture or distribution of tires and rims. According to TRA, it does not establish standards for the materials used in the manufacture of tires and rims; it does not mandate or monitor the use of its standards by any manufacturer; it does not inspect manufacturers’ operations; it does not specify any service or maintenance procedures; it does not have the power or authority to prevent any manufacturer from designing, manufacturing or selling a rim or tire of any particular size or design; it does not undertake to develop or promulgate safety measures or otherwise warn the public or industry as to potential hazards resulting from a tire and rim mismatch; and it does not interface with the consuming public. TRA merely performs a service to the automobile industry, it claims, by publishing tire and rim standards to facilitate interchangeability of products within the industry, but such standards are advisory only and adherence to them and their use is entirely within the control and discretion of each manufacturer. The yearbook itself contains disclaimers which essentially incorporate the foregoing.
The plaintiff does not dispute TRA’s factual allegations and, therefore, for the purposes of this motion, they will be accepted as true. Nevertheless, plaintiff argues, TRA as well as Kelsey-Hayes and General Tire have all conceded in examinations before trial that the standards promulgated by TRA have a significant influence upon dimensional standards within the tire and rim industry and that they have become the standards of industry. In addition, it appears that TRA was aware of the mismatch problem as early as 1971, prior to the manufacture of the tire and rim involved here. Although the problem was discussed at various meetings of TRA’s board of trustees and committees, no action was taken by it.
There is no dispute then about TRA’s importance in the establishment of standards in the industry. Essentially, the dispute focuses upon its authority with respect to such standards.
There is little legal authority regarding the liability of *29 manufacturers’ trade associations for injuries caused to persons by a product of a member manufacturer. The only case to address the subject is Hall v Du Pont De Nemours & Co. (345 F Supp 353), which, however, is readily distinguishable from the present case and thus provides little guidance. Hall and its companion case, Chance v Du Pont De Nemours & Co., involved suits by a number of children injured by blasting caps. In Chance the plaintiffs were unable to identify a particular manufacturer and thus brought suit against six major manufacturers in the industry and their trade association. The defendants moved to dismiss, but the court denied the motion, holding that plaintiffs’ allegations that the manufacturers obtained knowledge of risks to children and of feasible safety measures through their jointly sponsored trade association, to whom the manufacturers delegated at least some functions of safety investigation and design, could feasibly demonstrate a joint or cooperative control of the risk and thus provide a basis for enterprise liability (345 F Supp 353, 375, supra).
The case at bar, unlike Hall and Chance (supra), does not involve a situation where the manufacturers of the products could not be identified, thus justifying suit against the entire industry on a concerted action theory (see, Bichler v Lilly & Co., 55 NY2d 571; but see, Kaufman v Lilly & Co., 65 NY2d 449). Nor does the plaintiff plead concerted action as a theory of liability. There is also no proof submitted that the member manufacturers delegated the functions of collecting information as to injuries caused by the designs or of formulating safety measures to TRA, or that TRA assumed such functions.
Since TRA does not manufacture or market tires or rims generally and did not manufacture or market the tire or rim alleged to have caused the injury in this case, liability cannot be imposed upon it under the theories of either strict products liability or breach of warranty. These actions impose liability only against defendants who are directly involved in the manufacture or distribution of the product which caused the injury (Cover v Cohen, 61 NY2d 261; Bolm v Triumph Corp., 33 NY2d 151).
The only products TRA is responsible for placing in the stream of commerce are its publications. Although these publications contained the dimensional specifications for the tire and rim in question, the publications themselves did not produce the injuries and thus cannot serve as the basis for the imposition of liability under a theory of either strict products *30 liability or breach of warranty (see, Walter v Bauer, 109 Misc 2d 189, mod 88 AD2d 787; cf. Brocklesby v United States, 753 F2d 794).
As to the negligence cause of action, it is undisputed that TRA neither manufactures nor sells tires or rims, nor does it specify procedures for tire mounting or any other service or maintenance procedures. Although minutes from various TRA committee and subcommittee meetings indicate that the mismatch problem had been a topic for discussion, TRA has not undertaken to develop or promulgate safety measures or to warn the public as to potential hazards resulting from tire and rim mismatch.
The allegations that TRA established and approved designs and specifications for tires and rims overstate the function of TRA. Although the process by which new dimensional specifications and contour become approved for publication in the yearbook is not elaborated upon in the papers and exhibits submitted, it is apparent that a manufacturer would submit the dimensional specifications for publication in the EDI, where they would remain until the appropriate committee or subcommittee regarded the standards as acceptable, at which time they would become published in the yearbook. It remains the practice that the manufacturer seeking to have its design dimensional specifications become TRA approved proposes the specifications to TRA. Section 1 of article XI of TRA’s constitution provides that proposals for specifications may be brought when one member company is interested in manufacturing an item, and shall be brought before the association when two or more member companies are interested.
The purpose of TRA’s existence is limited to the approval and dissemination of norms, or the establishment of a consensus, within the industry as to dimensional specifications and contours to the extent that they involve the fit of tires on rims, with the ultimate objective of insuring interchangeability. Thus, TRA does not create or establish designs or specifications. It merely provides a forum for manufacturers who do. Nor does TRA approve designs or specifications except to the extent of accepting them for publication and, thereafter, promulgating dimensional specifications and rim contours by the publication and distribution of its yearbook and EDI.
A review of these activities is necessary in order to resolve the question essential to every negligence action, i.e., what duty did TRA owe to Mr. Beasock? (Pulka v Edelman, 40 *31 NY2d 781; Palsgraf v Long Is. R. R. Co., 248 NY 339, 342.) Absent a duty, there can be no breach and, thus, no liability (Kimbar v Estis, 1 NY2d 399, 405).
Plaintiffs claim that TRA is responsible because it promulgated dimensional standards which permitted mismatch injuries to occur presupposes that TRA is responsible for the products manufactured by others. However, it is clear that it had neither the duty nor the authority to control what the manufacturers produced.
A duty to control the conduct of others may arise from a variety of relationships (see generally, Prosser and Keeton, Torts § 56, at 383-385 [5th ed]). Such a duty, however, will not be imposed on one who does not control the tort-feasor (Pulka v Edelman, 40 NY2d 781, 784, supra). Where one does not commit the injury producing act directly, responsibility for its consequences requires, at the very least, a relationship with the tort-feasor sufficient to exercise control over the culpable conduct (Vogel v West Mountain Corp., 97 AD2d 46, 49).
Such control is lacking in this case. TRA neither mandates nor monitors the use of its standards by any manufacturer. The yearbook reiterates that which is the fact, i.e., that the information contained in it is advisory only and that any use made of the information "is entirely within the control and discretion of the user and is wholly voluntary”. Although TRA’s dimensional standards have become industry standards, it has not been shown that discontinuing publication of the specifications for certain size rims or tires would result in the manufacturers ceasing their production. It would be unreasonable to impose a duty of control upon TRA solely by virtue of its limited function of publishing dimensional specifications for interchangeability purposes, and then only after such specifications have been accepted by the industry at large.
For the same reason, a duty to warn may not be imposed upon TRA. Such a duty is generally imposed because of some special relationship between the parties, frequently involving some existing or potential economic benefit to the defendant (Schumacher v Richards Shear Co., 59 NY2d 239, 246-247; see also, Prosser and Keeton, op. cit., §56, at 374). It has long been settled that manufacturers, distributors and sellers are under a duty to give a reasonable warning of dangers in the use of products they furnish to those persons exposed to a foreseeable risk of harm (Cover v Cohen, 61 NY2d 261, 275, supra; Cohen v St. Regis Paper Co., 109 AD2d 1048, affd 65 *32 NY2d 752). Although there is an economic relationship between the manufacturer and the product alleged to have caused Mr. Beasock’s injury which imposes a duty to warn, there is no such economic relationship in this case between the decedent and a trade association of those manufacturers, such as TRA.
Lastly, although there is authority for the imposition of a duty upon one who disseminates erroneous information (Credit Alliance Corp. v Andersen & Co., 65 NY2d 536; White v Guarente, 43 NY2d 356; Ultramares Corp. v Touche, 255 NY 170), such duty arises only where the relationship between the parties is " 'so close as to approach that of privity’ ” (Credit Alliance Corp. v Andersen & Co., supra, p 546), or where there has been an affirmative assumption of a duty of care by the wrongdoer to the injured party (Glanzer v Shepard, 233 NY 236). No such relationship exists in this case.
For the foregoing reasons, TRA is entitled to summary judgment dismissing the complaint against it for failure to state a cause of action. Having resolved this motion on this substantive ground, the jurisdictional issue is rendered moot.