(No. 71212.—

DOROTHY VESEY, Indiv. and as Next Friend of Lonzo Vesey, Appellee, v. THE CHICAGO HOUSING AUTHORITY, Appellant.

*Opinion filed November 21, 1991.*

Moore & Maisel, of Chicago (Gary K. Moore and Thomas J. Branit, of counsel), for appellant.

Ronald G. Fleisher, of Karlin & Fleisher, and Gerald M. Sachs, of Sachs, Earnest & Associates, Ltd., all of Chicago (David A. Novoselsky and Tammy A. Koester, of David A. Novoselsky & Associates, of Chicago, of counsel), for appellee.

JUSTICE CLARK delivered the opinion of the court:

Plaintiff, Dorothy Vesey, individually and as next friend of her son, Lonzo Vesey, filed a two-count second-amended complaint in the circuit court of Cook County against defendant, the Chicago Housing Authority (hereinafter the CHA). In count I, plaintiff sought damages for personal injuries Lonzo suffered when he came in contact with an exposed steam heating pipe. In count II, plaintiff sought recovery of medical expenses she in-

curred in the treatment of Lonzo. The circuit court granted the CHA's motion for summary judgment. The appellate court reversed and held that the CHA had a duty of ordinary care under the Local Governmental and Governmental Employees Tort Immunity Act to "maintain[ ] all of its property in a *reasonably safe condition.*" (Emphasis in original.) (205 Ill. App. 3d 962, 971.) We granted the CHA's petition for leave to appeal (134 Ill. 2d R. 315).

In the early morning hours of March 25, 1984, six-month-old Lonzo Vesey came in contact with an exposed steam heating pipe in the apartment of his baby-sitter, Lola McClinton. At the time, Lonzo was being cared for by Lola and her sister, Josephine McClennon, in Lola's apartment at 120 N. Hermitage in the Henry Horner public housing apartments. On the night of the accident, Josephine put Lonzo to bed at approximately 10:30 p.m., placing him on his stomach with pillows propped on both sides of him. Josephine went to sleep next to Lonzo at 12:30 a.m., and woke up several hours later when she heard Lonzo screaming. Evidently, Lonzo had gotten out of the bed, crawled to the steam heating pipe which was located in the bedroom, and touched it with his left hand. Lola stated that Lonzo had been attracted to the steam heating pipe due to "clicking noises" it made while steam moved through it. Lonzo suffered severe burns to his left hand and thigh, and one of his fingers was later amputated. According to Myles Doran, the acting chief engineer of the Henry Horner apartments, the protective guard which was to cover the steam pipe to prevent residents from being burned had been pushed aside leaving the front area of the steam pipe exposed.

In her second-amended complaint, plaintiff alleges that the CHA was negligent in its maintenance of Lola's apartment in that it failed to provide a cover or guard for the steam heating coil; failed to repair the exposed

steam heating coil; failed to warn of the dangerous condition; and failed to set up and operate an inspection program to discover hazardous conditions on the premises. Plaintiff alleges that the CHA had "actual oral notice" of the defect in Lola's apartment at least five years prior to the accident.

In its motion for summary judgment, the CHA relied primarily on *Trotter v. Chicago Housing Authority* (1987), 163 Ill. App. 3d 398, and *Hubbard v. Chicago Housing Authority* (1985), 138 Ill. App. 3d 1013, for its claim that it was not negligent in this matter. In *Hubbard*, the plaintiff sued the CHA, claiming that it had acted negligently in failing to provide protective guards for hot steam pipes located in the plaintiff's apartment. The trial court dismissed the plaintiff's complaint for failure to state a cause of action. The appellate court affirmed the dismissal, stating that "[t]he steam pipes were simply hot and exposed, but not defective. Plaintiff was free to install safety guards around the steam pipes, but the lack of guards does not form the basis of liability on the part of [the CHA]." (*Hubbard*, 138 Ill. App. 3d at 1015.) Citing *Hubbard*, the appellate court in *Trotter* held that the defendant, the CHA, did not owe a duty to provide insulating material for exposed hot steam pipes in the apartments. (*Trotter*, 163 Ill. App. 3d 398; see also *Loving v. Chicago Housing Authority* (1990), 203 Ill. App. 3d 205.) In both *Trotter* and *Hubbard*, the appellate court noted the well-settled rule that a landlord is not liable for injuries sustained by a tenant on the demised premises. See *Lamkin v. Towner* (1990), 138 Ill. 2d 510.

In this case, the appellate court reversed the circuit court's order granting summary judgment, believing that the CHA owed plaintiff a duty under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (Ill. Rev. Stat. 1985, ch. 85, par. 1—

101 *et seq.*). Specifically, the appellate court cited section 3—102 of the Tort Immunity Act as support for its claim that the CHA owed a duty of reasonable care in this matter. Section 3—102 reads:

"(a) Except as otherwise provided in this Article, *a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition* for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in sufficient time prior to an injury to have taken measures to remedy or protect against such condition." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 85, par. 3—102(a).

The appellate court stated, "We conclude that the legislature, in enacting section 3—102, intended that a public entity would be held to the duty of ordinary care in maintaining *all of its property* in a reasonably safe condition, subject to the qualifications of that duty as set out in that section." (Emphasis added.) (205 Ill. App. 3d at 971.) In so holding, the appellate court seemingly rejected the common law principle that a landlord is not liable for injuries caused by a defective condition existing on premises leased to a tenant and under the tenant's control. (See *Lamkin*, 138 Ill. 2d at 518; *Rowe v. State Bank* (1988), 125 Ill. 2d 203, 220-21; *Wright v. Mr. Quick, Inc.* (1985), 109 Ill. 2d 236, 238.) The appellate court stated, "Section 3—102 does not condition the public entity's liability on its exclusive control over or possession of the premises in question." (205 Ill. App. 3d at 971.) Rather, the appellate court explained that section 3—102 requires actual or constructive notice on the part of the public entity in order to be held liable for unsafe conditions. (205 Ill. App. 3d at 971.) The appellate court

concluded that summary judgment was improper in this case because "[t]he record before us contains enough evidence that the CHA knew or should have known of the condition of the steam pipes and guard to let the case proceed to trial." 205 Ill. App. 3d at 971-72.

Before this court, the CHA maintains that the appellate court misinterpreted the Tort Immunity Act as creating a duty on the part of the CHA to maintain the exposed hot steam pipe so as to prevent Lonzo from being burned. Specifically, the CHA claims that the appellate court has abolished for public entities the common law's distinction between demised premises and common areas, and has imposed a unique duty on public entities to maintain and inspect those demised portions of their property of which they have no possession or control. The CHA argues that no such duty exists at common law for public or private landlords, and the imposition of such a duty on public entities subverts the purpose of the Tort Immunity Act. The plaintiff, on the other hand, claims that this court need not consider the broad issue of interpreting section 3–102 of the Tort Immunity Act. Rather, the plaintiff argues that the facts of this case demonstrate a "classic example" of voluntary undertaking on the part of the CHA, and that summary judgment should be denied since material facts are in dispute. Regarding the appellate court's interpretation of section 3–102, the plaintiff asserts that its interpretation is correct.

We agree with the CHA that the appellate court erred in holding that the Tort Immunity Act imposed a duty on the CHA to maintain the exposed hot steam pipe so as to have prevented Lonzo from being burned. Further, we disagree with plaintiff's argument that under the voluntary-undertaking theory of liability, sufficient facts are in dispute that the circuit court should have denied the CHA's motion for summary judgment.

Initially, we note that this matter is before us on the CHA's motion for summary judgment. A motion for summary judgment should be granted when the pleadings, depositions, and affidavits reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (See Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c).) Further, in an action for negligence, the plaintiff must set out sufficient facts establishing the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately resulting from the breach. (*Rowe*, 125 Ill. 2d at 215; *Curtis v. County of Cook* (1983), 98 Ill. 2d 158, 162; *Pelham v. Griesheimer* (1982), 92 Ill. 2d 13, 18; *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 374.) In the absence of a showing from which the court could infer the existence of a duty, no recovery by the plaintiff is possible as a matter of law and summary judgment in favor of the defendant is proper. (*Rowe*, 125 Ill. 2d at 215.) Whether under the facts of a case there is a relationship between the parties requiring that a legal obligation be imposed upon one for the benefit of another is a question of law to be determined by the court. *Rowe*, 125 Ill. 2d at 215; *Pelham*, 92 Ill. 2d at 18-19; *Barnes v. Washington* (1973), 56 Ill. 2d 22, 26.

Because the CHA is a municipal corporation, and thus a "local public entity" for purposes of the Tort Immunity Act (see Ill. Rev. Stat. 1985, ch. 85, par. 1—206), whether the CHA owes a duty of ordinary care to maintain its property for the benefit of the plaintiff in this matter is governed by the Tort Immunity Act. (See *Davis v. Chicago Housing Authority* (1990), 136 Ill. 2d 296.) The appellate court recognized this and determined that the CHA did owe such a duty to the plaintiff based on section 3—102 of the Tort Immunity Act. We, however, believe that the appellate court misconstrued the Tort Immunity Act, and specifically section 3—102.

"The Local Governmental and Governmental Employees Tort Immunity Act, which was enacted at least in part as a result of this court's rejection of the principles underlying the sovereign immunity doctrine in *Molitor v. Kaneland Community Unit District No. 302* (1959), 18 Ill. 2d 11, is in derogation of the common law action against governmental entities and specifies certain limitations on the liability of such bodies." (*Curtis v. County of Cook* (1983), 98 Ill. 2d 158, 164; *Helle v. Brush* (1973), 53 Ill. 2d 405, 407; *Reynolds v. City of Tuscola* (1971), 48 Ill. 2d 339, 342; *Warchol v. City of Chicago* (1979), 75 Ill. App. 3d 289, 294; *Mounce v. City of Lincoln* (1978), 64 Ill. App. 3d 461, 463.) The Tort Immunity Act explicitly states that its purpose "is to protect local public entities and public employees from liability arising from the operation of government. *It grants only immunities and defenses.*" (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 85, par. 1—101.1(a).) Moreover, subsection (b) of section 1—101.1 states:

> "(b) Any defense or immunity, common law or statutory, available to any private person shall likewise be available to local public entities and public employees." Ill. Rev. Stat. 1989, ch. 85, par. 1—101.1(b).

In interpreting the scope of the Tort Immunity Act, our appellate court has indicated on many occasions that the Act does not create any new liabilities for negligent acts or omissions which did not previously exist, but rather articulates the common law duty to which the subsequently delineated immunities apply. *Horrell v. City of Chicago* (1986), 145 Ill. App. 3d 428, 435; see also *Goodknight v. Piraino* (1990), 197 Ill. App. 3d 319, 327 ("the Tort Immunity Act simply codifies the common law duty of a local public entity to maintain its property"); *Swett v. Village of Algonquin* (1988), 169 Ill. App. 3d 78, 92 ("It is not a 'Tort Duty Act.' [Citation.] The [Tort Immunity] Act itself creates no new duties");

*Porter v. City of Urbana* (1980), 88 Ill. App. 3d 443, 445 ("The Tort Immunity Act is not a catalog of duties or a source of rights; it does not create new liabilities where none already exist"); *Hannon v. Counihan* (1977), 54 Ill. App. 3d 509.

The traditional common law duty of local public entities concerning public property is to maintain that property in a reasonably safe condition. (*Curtis v. County of Cook* (1983), 98 Ill. 2d 158, 163.) However, in terms of the principles of landlord and tenant law, a landlord is not liable for injuries sustained on the premises leased to the tenant.

> "It is axiomatic that if a landlord retains control of a portion of the premises leased to the tenant it has the duty, as the party in control, to use ordinary care in maintaining that part of the premises in a reasonably safe condition. [Citations.] Conversely, *a landlord is not liable for injuries caused by a defective condition on the premises leased to a tenant and under the tenant's control.*" (Emphasis added.) *Rowe v. State Bank* (1988), 125 Ill. 2d 203, 220-21.

*Wright v. Mr. Quick, Inc.* (1985), 109 Ill. 2d 236, 238; *Wagner v. Kepler* (1951), 411 Ill. 368, 371.

As noted earlier, the appellate court interpreted section 3—102 to require that "a public entity would be held to the duty of ordinary care in maintaining *all of its property* in a reasonably safe condition" (emphasis added) (205 Ill. App. 3d at 971), including the demised premises of the Henry Horner public housing complex. Further, the appellate court stated that "[t]o the extent this legislative expression of duty [*e.g.,* section 3—102] in the public housing context conflicts with other, general principles of landlord/tenant relationships, the statute controls." (205 Ill. App. 3d at 971.) This analysis misstates the language in section 3—102, and incorrectly interprets the purpose of the Tort Immunity Act. Section

3—102 explicitly states that "a local public entity has the duty to exercise ordinary care to maintain *its property* in a reasonably safe condition." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 85, par. 3—102(a).) No reference is made to the phrase "*all of its property*," as the appellate court holds.

In addition, after analyzing the Act, it is clear that the legislature did not intend for section 3—102 to require a local public entity to maintain the demised portions of its property in a reasonably safe condition, and thus conflict with the principles of landlord and tenant law. Section 3—102 of the Tort Immunity Act merely codified the common law duty of local public entities. It did not create new duties or liabilities for public entities which did not previously exist. As stated in its purpose section, "[the Act] grants only immunities and defenses." (Ill. Rev. Stat. 1985, ch. 85, par. 1—101.1(a).) Despite the appellate court's reasoning, the Tort Immunity Act did not diminish or override the above-cited principles of landlord and tenant law. We believe that the general duty of public entities set out in section 3—102 of the Tort Immunity Act must be read in conjunction with the common law principle that "where a defective condition exists on premises leased to a tenant and under the tenant's control, a landlord is not liable for injuries caused by the condition." (*Lamkin v. Towner* (1990), 138 Ill. 2d 510, 518.) Therefore, the appellate court's conclusion that section 3—102 of the Tort Immunity Act requires that "a public entity *** be held to the duty of ordinary care in maintaining all of its property in a reasonably safe condition" (emphasis omitted) (205 Ill. App. 3d at 971), *including the demised premises in the Henry Horner public housing complex,* flies in the face of traditional landlord and tenant law, and therefore must be rejected. Given that the Tort Immunity Act merely codified the common law duty of a local public

entity to maintain its property, and did not create new duties for public entities, we find that the appellate court misconstrued section 3—102 of the Tort Immunity Act as having required the CHA to maintain the exposed steam pipe so as to have prevented Lonzo from being burned.

Although we conclude that the CHA did not have a duty under the Tort Immunity Act, because the CHA voluntarily placed a protective guard over the steam pipe in Lola's apartment the CHA had a duty to exercise ordinary care in the installation of this protective guard. (See *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69 (holding that an insurer was liable for personal injuries suffered as a result of the negligent performance of a gratuitous inspection of the premises where the injuries occurred).) Pursuant to the voluntary-undertaking theory of liability, one who gratuitously renders services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care or " 'such competence and skill as [one] possesses.' " (*Cross v. Wells Fargo Alarm Services* (1980), 82 Ill. 2d 313, 317, quoting *Nelson*, 31 Ill. 2d at 85-86.) In *Nelson*, this court stated:

> "It is axiomatic that every person owes to all others a duty to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of his act, and that such duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Nelson*, 31 Ill. 2d at 86.

In addition to the above, in *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, this court implicitly adopted section 324A of the Restatement (Second) of Torts, which states:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his

things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts §324A (1965).

The trial court granted the CHA's motion for summary judgment, stating that there is "no evidence at all of any negligent undertaking." The appellate court declined to consider this issue because it had found a duty based on section 3—102 of the Tort Immunity Act. However, the appellate court did state that it "question[ed] the suitability of the negligent undertaking theory under the facts of this case." (205 Ill. App. 3d at 975.) Currently, the plaintiff argues that, by placing a protective guard on the hot steam pipe in Lola's apartment and other apartments in the Henry Horner housing complex, the CHA undertook to guard the steam pipe and prevent tenants from being burned. The plaintiff argues that, as evidenced by the fact that this protective guard was not in its proper position on the night of Lonzo's accident, the CHA performed this undertaking negligently. In addition, the plaintiff argues that the CHA had a policy of maintaining these protective guards and replacing defective guards with new guards kept at the apartment complex.

As we noted earlier, this case arises in a summary judgment context. The purpose of summary judgment is not to try an issue of fact but to determine if one exists. After reviewing the pleadings, affidavits and depositions on file, we do not believe that a genuine issue of material fact exists as to whether the CHA performed its voluntary undertaking negligently. The duty of care to be

imposed on the CHA is limited to the extent of its undertaking. (See *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 210.) In this case, the extent of the CHA's undertaking was the installation of a protective guard in 1955 over the hot steam pipe in Lola's apartment. We do not believe that the plaintiff has a valid cause of action for negligent undertaking under subsection (a) of the Restatement (Second) of Torts, section 324A. The facts in this matter do not support the plaintiff's claim that the CHA failed to exercise reasonable care when it initially installed the protective guard in 1955. Other than the plaintiff's unsupported legal conclusion that the CHA negligently performed the initial installation, there are no facts argued or evident from the record to suggest that the CHA acted negligently in the initial installation of the protective guard. In fact, at the hearing on the CHA's motion for summary judgment, the plaintiff's attorney acknowledged that he does not know if the guard in Lola's apartment was "affixed in an improper fashion initially." The fact that 29 years after the initial installation the protective guard was not in its proper position does not support the plaintiff's claim that the CHA negligently installed the guard in 1955. Due to the mere passage of time, the movement of furniture, or other common activity in the apartment, the protective guard could have been knocked out of position. The apartment, obviously, was not under the control of the CHA.

Regarding the plaintiff's contention that the CHA voluntarily undertook to maintain and replace defective guards in the Henry Horner apartments, and that the CHA performed such an undertaking negligently in Lola's apartment, we believe that the facts are in dispute whether the CHA had voluntarily assumed this duty. Myles Doran, the acting chief engineer for the CHA at the Henry Horner apartments, testified at his deposition

that his main function was to "maintain heat \*\*\* to take care of any complaints on heating or hot water." In response to the question of whether he specifically had been in Lola's apartment, he stated that while he was not sure, he might have been because "[the CHA] went to every apartment to clear radiators." Further, in response to the question of whether the CHA made repairs to defective protective guards, Doran stated that "[*the CHA made repairs*] *where they are needed*" and that "*if any* [*protective*] *guard is missing,* [*the CHA*] *replaces one.*" (Emphasis added.) According to Doran, the CHA kept replacement guards at its heating plant located one block from the Henry Horner apartments. Based on the foregoing testimony, it is arguable that the CHA had a policy of maintaining these protective guards and replacing defective guards with new guards kept at the apartment complex.

However, as the CHA points out, there are no facts in dispute regarding whether the CHA actually performed any acts of maintenance on the protective guard in Lola's apartment. Lola acknowledged that since she moved into the apartment, no repairs or modifications had been done to the heating system. Thus, the CHA argues that this case involves nonfeasance as opposed to malfeasance, and that based on *Nelson,* the plaintiff is obligated to show some reliance by Lola or Josephine that the CHA would repair and/or replace the alleged defective guard. (See *Nelson,* 31 Ill. 2d at 86 ("We think it clear under the law that defendant's liability for the negligent performance of its undertaking, *as distinguished from a failure to perform,* is not limited to such persons as might have relied upon it to act but extends instead to such persons as defendant could reasonably have foreseen would be endangered as the result of negligent performance" (emphasis added)); see also Restatement (Second) of Torts §324A(c) (1965).) The plaintiff does not argue the issue of reliance in her brief. However, the

CHA maintains that the facts completely fail to establish any promise by the CHA to repair or replace the protective guard, or any expectation by Lola or Josephine that the CHA would repair the protective guard.

We agree. Subsection (c) of section 324A states that liability results if "the harm is suffered because of reliance of the other or the third person upon the undertaking." The rationale for subsection (c), which appears in the comments to that section, states:

> "Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk." Restatement (Second) of Torts §324A, comment *e* (1965).

It is fairly obvious that Lonzo, being six months old, did not rely on the CHA to repair or replace the protective guard in Lola's apartment. Thus, the question focuses on whether Lola or Josephine relied on or expected the CHA to repair or replace the protective guard.

Although both Lola and Josephine filed affidavits stating that Lola repeatedly complained to the CHA regarding the lack of a proper covering over certain sections of the hot steam pipe in her apartment, their subsequent deposition testimonies belie the truthfulness of these affidavits. In her affidavit, Lola stated that prior to her moving into the apartment at the Henry Horner apartments, she inspected the premises with a CHA employee who wrote down her complaints. During this inspection, Lola claims that she mentioned the lack of a protective guard over the steam pipe, and the CHA employee advised her that the needed repairs would be forthcoming. Lola further stated in her affidavit that between the time she moved into her apartment and the date of Lonzo's accident, she made numerous complaints both by phone and in person to the CHA regarding the

lack of a cover over the steam pipe. In addition, Lola stated that her sister Josephine burned herself twice on the exposed pipe, and that Lola complained to the CHA after each incident. Josephine's affidavit was consistent with Lola's in that Josephine also stated that she had burned herself twice on the exposed pipe, and that she was present when Lola complained to the CHA, both personally and over the telephone regarding the lack of a protective guard.

Lola's and Josephine's affidavits were dated August 27, 1986. Subsequently, on September 16 and 17, 1986, respectively, the discovery depositions of Lola and Josephine were taken. In her deposition testimony, Lola initially stated that when she inspected her apartment with the CHA employee in 1976 prior to moving in, she could not recall whether she complained about the radiators. However, her later testimony thoroughly contradicted the assertion in her affidavit that, prior to Lonzo's accident, she had notified the CHA of the allegedly defective guard, and requested the CHA to repair it. The following colloquy reveals this contradiction:

"Q. [CHA counsel]: After you moved in, did you at any time call the CHA about the radiator?

A. [Lola]: I called the CHA for a lot of things.

Q. Okay. Did you ever call them about the radiator?

A. I think I did once. I'm not for sure.

Q. Is that before March or after March of 1984?

A. I think it was before March.

Q. Do you know who you talked to?

A. One of the receptionists that answer the phone. I don't know her name.

Q. Did she identify herself?

A. No, she just said, 'CHA, may I help you.'

Q. When did you make the phone call?

A. It was around January.

Q. Of what year?

A. Of '83 or '82.

Q. Is that the only call you remember making?

A. Yes.

Q. *What did you say to the person who answered the phone?*

A. *I told them I need the radiator, it needs to be turned on.*

Q. Okay. Was your apartment cold?

A. Yeah.

Q. *Did you say anything else about the radiator?*

A. *No.*

Q. Was that the only time that you've called?

A. That's the only time I remember.

Q. Okay. *Do you remember ever going into the office or ever writing a letter to the office?*

A. *No.*" (Emphasis added.)

Subsequent to the above exchange, Lola was shown a photograph of the specific area on the steam pipe where Lonzo injured himself, and she was asked to circle the place of the injury. Then, the following colloquy took place:

"Q. [CHA counsel]: *Either after or before the accident, did you at any time talk to anyone who was employed by the Chicago Housing Authority about the area [where Lonzo hurt himself]?*

A. *No.*

Q. *Did anyone from the CHA ever talk to you about the area [where Lonzo hurt himself]?*

A. *No.*

Q. *Before or after the accident, did you write to the CHA or did the CHA write to you about that area [where Lonzo hurt himself]?*

A. *No.*" (Emphasis added.)

On one other occasion during her deposition, Lola was specifically asked whether she ever requested the CHA to cover the steam pipe in her apartment, and she replied "no."

Based on Lola's testimony under oath, we believe that it is abundantly clear that Lola never requested the

CHA to remedy the allegedly defective guard covering the steam pipe in her apartment. Her deposition testimony contradicts the statements in her affidavit that she notified the CHA about the protective guard. Further, Josephine's affidavit, which stated that she was present when Lola made phone complaints and in-person complaints to the CHA regarding the allegedly defective guard, also must be discounted in light of Lola's testimony. Josephine never stated in her affidavit or at her deposition that she personally contacted the CHA regarding the allegedly defective guard, only that Lola had made phone and in-person complaints. Given that Lola repeatedly denied that she had requested the CHA to repair the protective guard, we are unable to conclude that any facts establish reliance by Lola or Josephine that the CHA would repair or replace the protective guard. Thus, after reviewing the pleadings, affidavits, and depositions filed in this matter, we believe that the CHA is entitled to summary judgment as a matter of law.

The facts in this case do not demonstrate that either Lola or Josephine had any specific expectation that the protective guard would be repaired, or that either relied upon the allegedly defective guard to prevent injuries. Lola stated that from the time she moved into the apartment in 1976 until Lonzo's accident in 1984, the protective guard was not in its proper position, and that no repairs or modifications had been done to the heating system. Her deposition testimony was clear that she never requested the CHA to repair the allegedly defective guard. Further, Lola stated that she had never tried to repair the protective guard herself. Because Lola lived in her apartment for eight years with the allegedly defective guard and never once requested the CHA to repair the guard, we believe that no facts support the inference that Lola or Josephine relied upon the CHA to repair the guard.

For the foregoing reasons, we hold that the trial court was correct in granting summary judgment. The judgment of the appellate court is reversed, and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*