THIRD DIVISION

September 21, 1999

No. 1-98-3217

RICHARD BAILEY, )  APPEAL FROM THE

)  CIRCUIT COURT OF

Plaintiff, )  COOK COUNTY. 

) 

v. ) 

)

EDWARD HINES LUMBER CO., et al. )

)

Defendants. ) 

______________________________________  )  97 L 13269

)

EDWARD HINES LUMBER CO. )

)

Third-Party Plaintiff-Appellant, )

)

v. ) 

) 

TRUSS PLATE INSTITUTE, )  HONORABLE

)  JAMES M. VARGA,

Third-Party Defendant-Appellee. )  JUDGE PRESIDING.

JUSTICE WOLFSON delivered the opinion of the court:

Until now, no reviewing court in Illinois has decided whether a trade association owes a duty of reasonable care to construction workers who rely on installation instructions it has released to the industry.  We hold that, under the facts of this case, no duty is owed.  For that reason, we affirm the trial court's grant of summary judgment to third-party defendant Truss Plate Institute (TPI) in the action brought by third-party plaintiff Edward Hines Lumber Company (Hines).

FACTS

On June 24, 1991, three carpenters installing a wood roof truss system at the Evergreen Plaza Shopping Center in Vernon Hills were injured when several trusses collapsed.  Hines had designed, built, and furnished the truss system to comply with the architect's plans.  With the truss system, Hines also provided the construction workers with a document called the "Green Sheet," published by TPI, a non-profit trade association representing the truss plate manufacturing industry.  The Green Sheet was a single, two-sided, legal-size sheet reduction of an 18-page pamphlet entitled "Bracing Wood Trusses: Commentary and Recommendations" (BWT-76).

The "tentative recommendations" provided in the Green Sheet begin with a caveat:

"While the recommendations for bracing contained herein are technically sound, it is not intended that they be considered the 
only
 method for bracing a roof system.  Neither should these recommendations be interpreted as superior to or a standard that would necessarily be preferred in lieu of an architect's or engineer's design for bracing a particular roof system.

These recommendations for bracing wood trusses originate from the collective experience of leading technical personnel in the wood truss industry, but must, due to the nature of the responsibilities involved, be presented only as a 
guide
 for the use of a qualified building designer, builder, or erection contractor.  Thus, the Truss Plate Institute expressly disclaims any responsibility for damages arising from the use, application, or reliance on the recommendations and information contained herein by building designers or by erection contractors."  (Emphasis in original.)

When the carpenters sued Hines, Hines impleaded TPI.  Hines' third-party complaint alleged TPI proximately caused the carpenters' injuries by failing "to provide adequate instructions for the erection of roof trusses" and failing "to provide adequate warnings for the safe erection of roof trusses."  Hines asked for contribution from TPI if Hines were found liable to the carpenters'.

On April 1, 1996, the trial court granted TPI's summary judgment motion.  More than two years later, on July 9, 1998, the trial court granted Hines' Rule 304(a) motion.  See 155 Ill. 2d R. 304(a).  On July 30, 1998, the court denied Hines' motion to reconsider the summary judgment order, and this appeal followed.

DECISION

We review 
de
 
novo
 the trial court's decision to grant summary judgment.  
Murneigh v. Gainer
, 177 Ill. 2d 287, 298, 685 N.E.2d 1357 (1997).

Hines' third-party complaint against TPI is based on the Contribution Act, 740 ILCS 100/.01 
et
 
seq.
 (West 1994).  The basis for a third-party defendant's obligation to contribute is its liability to the original plaintiff.  
Taake v. WHGK, Inc.
, 228 Ill. App. 3d 692, 715, 592 N.E.2d 1159 (1992).  We, therefore, must examine TPI's alleged negligence liability to the carpenters here.

The elements of a common law negligence claim are a duty owed by the defendant to the plaintiff, breach of that duty by the defendant, and damages proximately caused by that breach.  
Ward v. K Mart Corp.
, 136 Ill. 2d 132, 140, 554 N.E.2d 223 (1990).  If the plaintiff fails to establish an element of its negligence claim, summary judgment is appropriate.  
Smith v. Tri-R Vending
, 249 Ill. App. 3d 654, 657, 619 N.E.2d 172 (1993).

Hines' appeal raises two issues: duty and causation.  Because of the conclusion we reach in this case, we limit our discussion to the matter of duty.  That is, does a construction trade association, which disseminates discretionary installation recommendations for the products it represents, owe a duty of reasonable care to construction workers who rely on these recommendations?

Summary judgment is appropriate where the defendant owed no duty to the plaintiff.  
Jania v. Aguilera
, 293 Ill. App. 3d 940, 942, 689 N.E.2d 183 (1997).  The issue of whether a duty exists is a question of law.  
Kuzmanich v. Cobb
, 276 Ill. App. 3d 634, 637, 659 N.E.2d 39 (1995).

In analyzing the duty issue, we ask whether the plaintiff and the defendant stood in such a relation to each other that the law should impose an obligation of reasonable conduct on the defendant for the benefit of the plaintiff.  
Ward
, 136 Ill. 2d at 140.
  To determine whether a duty of reasonable care exists we examine several factors: the reasonable foreseeability of the injury, the likelihood of the injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendant.  
Ward
, 136 Ill. 2d at 140; 
Kirk v. Michael Reese Hospital
, 117 Ill. 2d 507, 526, 513 N.E.2d 387 (1987).

Illinois courts never have addressed Hines' duty issue, so we turn our attention to cases from other jurisdictions examining trade association liability in similar circumstances.  See generally Annotation, 
Products Liability of Endorser, Trade Association, Certifier, or Similar Party Who Expresses Approval of Product
, 1 A.L.R.5th 431 (1992).

In 
Evenson v. Osmose Wood Preserving, Inc.
, 760 F. Supp. 1345 (S.D. Ind. 1990), a wood treatment worker used a pesticide manufactured by a wood preservation company.  After he developed asthma and chest pain allegedly attributable to the pesticide, the worker sued a wood preservation industry trade association.  The trade association contended it owed no duty to warn the worker about the dangers presented by the pesticide.

In granting summary judgment to the trade association, the court agreed:

"In the instant case, the plaintiff has alleged no facts showing that AWPI [the trade association] owed him a duty to communicate the dangers of working with [the pesticide].  AWPI is a trade association; it is undisputed that AWPI did not manufacture, sell[,] distribute, design, test, conduct safety research on, or set standards for [the pesticide].  We believe that there is no relationship upon which plaintiff may base a claim for negligence against AWPI."  
Evenson
, 760 F. Supp. at 1349.

In 
Klein v. Council of Chemical Associations
, 587 F. Supp. 213 (E.D. Pa. 1984), a printing industry worker was exposed to various commercial chemicals over a 50-year period.  After he developed bladder cancer allegedly attributable to these chemicals, the worker sued several trade associations representing the printing industry.  These defendants contended they owed no duty to warn the worker of the dangers presented by these chemicals.  The court dismissed the worker's complaint against the trade associations because they did not produce or supply the chemicals to which he was exposed.  
Klein
, 587 F. Supp. at 525.

In 
Meyers v. Donnatacci
, 220 N.J. Super. 73, 531 A.2d 398 (Super. Ct. 1987), a swimming pool user became paralyzed after diving into the pool's shallow end.  The pool user sued the pool industry trade association for negligence, alleging the trade association failed to disseminate information on the hazards of shallow-end diving.  The trade association contended it owed no duty to the pool user.

The court agreed with the trade association, holding the trade association and the pool user had no special relationship.  
Meyers
, 531 A.2d at 402.  The court explained: "[The trade association] provides various services and programs to its 
members
 so as to achieve an ever expanding public interest in swimming and aquatics in general.  Its services are directed 
to its membership
 in an attempt to provide a forum where the members can exchange ideas."  (Emphasis in original.)  
Meyers
, 531 A.2d at 403.  The court also noted the trade association promulgated "
Suggested Minimum
 Standards for Residential Swimming Pools."  (Emphasis in original.)  
Meyers
, 531 A.2d at 403.  The trade association had very little power to enforce these discretionary standards.  
Meyers
, 531 A.2d at 403.  Accord 
Howard v. Poseidon Pools, Inc.
, 133 Misc. 2d 50, 506 N.Y.S.2d 523, 527 (Sup. Ct. 1986), 
aff'd in part, rev'd on other grounds
, 134 A.D.2d 926, 522 N.Y.S.2d 388 (App. Div. 1987)(swimming pool industry trade association owed no duty to a pool user because it did not have the authority to control the tortfeasing manufacturer).

In 
Beasock v. Dioguardi Enterprises, Inc.
, 130 Misc. 2d 25, 494 N.Y.S.2d 974 (Sup. Ct. 1985), a driver was killed when his tire exploded while he inflated it.  The driver's wife sued the tire and rim industry trade association, alleging the trade association failed to correct a tire/rim mismatch in its annual industry publication.

The court held the trade association owed no duty to the driver because it did not exercise control over tire and rim manufacturers.  
Beasock
, 494 N.Y.S.2d at 979.  The trade association's publication merely "*** reiterates *** that the information contained in it is advisory only and that any use made of the information 'is entirely within the control and discretion of the user [manufacturer] and is wholly voluntary."  
Beasock
, 494 N.Y.S.2d at 979.  See 
Friedman v. F.E. Meyers Co.
, 706 F. Supp. 376, 383 (E.D. Pa. 1989)(water pump manufacturer trade association owed no duty to homeowners); 
Gunsalus v. Celotex Corp.
, 674 F. Supp. 1149, 1157 (E.D. Pa. 1987)(tobacco industry trade association owed no duty to smoker)
.

The courts in these cases declined to impose a duty on the trade associations either because they did not manufacture the injury-causing products or because they did not exercise control over the manufacturers of those products.  Here, like the trade associations in 
Evenson
 and 
Klein
, TPI did not manufacture the product which injured the plaintiffs.  Hines designed, manufactured, and delivered the truss system.  And here, like the trade associations in 
Meyers
 and 
Beasock
, TPI exercised no control over the manufacturer of the product.  TPI intended the Green Sheet as a "guide," and it could not require Hines to follow its installation instructions.

We have found only three cases imposing a duty on a trade association.  Two of these cases involve the blood bank trade association, which "sought and cultivated" responsibility for blood safety and today dominates "the establishment of standards for the blood-banking industry."  See 
Snyder v. American Ass'n of Blood Banks
, 144 N.J. 269, 676 A.2d 1036, 1048 (1996);
 
Weigand v. University Hospital of New York University Medical Center
, 172 Misc. 2d 716, 659 N.Y.S.2d 395, 399 (Sup. Ct. 1997).

The other case, 
King v. National Spa & Pool Institute, Inc.
, 570 So. 2d 612, 618 (Ala. 1990), involved a swimming pool industry trade association which promulgated safety standards, seeking to influence its members' design and construction practices after studying "the needs of the consumer."  See also 
Arnstein v. Manufacturing Chemists Ass'n, Inc.
, 414 F. Supp. 12, 14 (E.D. Pa. 1976) (chemical company worker's complaint survived motion to dismiss against chemical industry trade association, which sponsored chemical research, emphasized chemical education, and published chemical safety standards).

In these cases the trade associations exercised a degree of control over their members well above that which TPI may have enjoyed in disseminating its "tentative recommendations" to be used "only as a guide ***."

We have considered the public policy consequences of holding a trade association such as TPI owes a duty to consumers.  
Ward
, 136 Ill. 2d at 140-41.

Here, TPI asserts finding a duty will chill its publication of installation recommendations.  
In 
FNS Mortgage Service Corp. v. Pacific General Group, Inc.
, 24 Cal. App. 4th 1564, 29 Cal. Rptr. 2d 916, 923 (1994), the court discounted the trade association's argument that imposing a duty on the trade association would curtail further inspections:

"[The trade association] asserts that the imposition of liability would cause it to withdraw from the field of inspection and certification of manufactured products subject to its standards.  *** The claim is vastly overblown; the imposition of liability for negligence for the conduct in this case does not entail a guarantee of the products that [the trade association] lists, only that it reasonably perform the tasks it has undertaken.

In any event, we are chary of indulging a conclusionary, self-serving assertion of this nature by a litigant, unsupported by appropriate fiscal evidence, especially in the context of a summary judgment motion."  
FNS Mortgage
, 29 Cal. Rptr. 2d at 924.

But we think public policy provides more support to the trade association than the 
FNS Mortgage
 court was willing to give.  As the 
Meyers
 court said:

"Such organizations serve many laudable purposes in our society.  They contribute to the specific industry by way of sponsoring educational activities, and assisting in marketing, maintaining governmental relations, researching, establishing public relations, standardization and specification within the industry, gathering statistical data and responding to consumer needs and interests.  Furthermore, trade associations often serve to assist the government in areas that it does not regulate."  
Meyers
, 531 A.2d at 404.

Public policy alone might not be reason enough to reject a duty in this case, but it does become part of the legal mix that leads us to that conclusion.  However, we make no ringing policy pronouncement concerning the non-existence of a duty in all cases involving trade associations.  Our decision is confined to the record before us.

Carpenters were the eventual intended users of the Green Sheet.  But it is the lack of oversight and control over the use of the "tentative recommendations" that speaks persuasively against the existence of a duty.  BWT-76 and its successor, HIB-

91, containing expanded recommendations, were distributed to industry members for whatever use they thought appropriate.  Any relationship that might have existed between TPI and the installers was remote at best.  TPI could do little to ensure the workers received its most recent recommendations.

The record indicates Hines had a copy of HIB-91 before the accident on June 24, 1991, but failed to distribute it to the carpenters.

Charles Goehring (Goehring), TPI's managing director, testified TPI's May 1991 newsletter announced HIB-91 was available to TPI members.  Goehring said TPI regularly sent a copy of new documents to its members, including Hines, when they were published.

Antonio Fanizza (Fanizza), the project's architect and general contractor, testified he heard after the accident Hines had provided the wrong set of truss installation instructions: "I was made aware afterwards there was another instruction should have come [sic] with the system, with the trusses."  Fanizza discovered Hines had HIB-91 when it delivered the original trusses.

Michael Henningson (Henningson), manager of contracts and engineering at Hines' components division, conceded HIB-91 was available "during the year 1991," but that Hines did not send it to the construction site until it sent the replacement trusses after the accident.  (At oral argument, Hines conceded it had HIB-91 before the injury, but did nothing to communicate its contents to the carpenters.)

TPI's inability to oversee or control access to the recommendations or their use underscores the "magnitude of the burden of guarding against" installer injury under these circumstances.  
Ward
, 136 Ill. 2d 140-41.  We see no reason to expand the concept of duty in this case.

Hines further contends TPI may have voluntarily undertaken a duty to the carpenters by distributing the Green Sheet.

Illinois courts have adopted section 324A of the Second Restatement of Torts to analyze voluntary undertaking claims.  See 
Vesey v. Chicago Housing Authority
, 145 Ill. 2d 404, 415-16, 583 N.E.2d 538 (1991); 
Charleston v. Larson
, 297 Ill. App. 3d 540, 546, 696 N.E.2d 793 (1998).
  Section 324A provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."  Restatement (Second) of Torts §324A (1965).

The essential element of the voluntary undertaking doctrine is an undertaking.  And the duty of care imposed on a defendant is limited to the extent of its undertaking.  
Rhodes v. Illinois Central Gulf R.R. Co.
, 172 Ill. 2d 213, 239, 665 N.E.2d 1260 (1996); 
Decker v. Domino's Pizza, Inc.
, 268 Ill. App. 3d 521, 526, 644 N.E.2d 515 (1994).   Assuming the Green Sheet constituted an undertaking, the extent of TPI's undertaking was to provide a "guide," not the definitive source, on truss system installation.  TPI disclaimed any responsibility for untoward consequences resulting from its recommendations.  We fail to see how TPI's "technically sound," but non-binding, instructions constituted a voluntary undertaking as that phrase is used by the Restatement.

We have examined the voluntary undertaking cases decided under section 324A in this and other states.  None supports the existence of a duty where the relationship between the defendant and the injured party is as remote as it is in this case.

Our Supreme Court instructs us, on public policy grounds, to apply a "narrow construction" when measuring the extent of the defendant's undertaking.  
Frye v. Medicare-Glaser Corp.
, 153 Ill. 2d 26, 33, 605 N.E.2d 557 (1992).  There, the plaintiff's husband took a prescription painkiller after he had knee surgery.  The pharmacy labeled his prescription bottle with a warning the painkiller might cause drowsiness, but did not use a warning alcohol would intensify the drug's effect.  The plaintiff's husband died several days later from the combined use of the painkiller and alcohol.  The plaintiff sued the pharmacy for failing to place an alcohol warning label on his prescription bottle.

The court noted, "Under the voluntary undertaking theory of liability, the duty of care to be imposed on a defendant is limited to the extent of the undertaking."  
Frye
, 153 Ill. 2d at 28.  The plaintiff contended the pharmacy's voluntary undertaking was to warn of all potential dangers associated with the painkiller, but the court rejected the plaintiff's "overly broad interpretation" of the pharmacy's undertaking.  
Frye
, 153 Ill. 2d at 33.  The court's "narrow construction" of the undertaking was "the placing of the 'drowsy eye' label" on the prescription bottle.  
Frye
, 153 Ill. 2d at 33.

Hines' contention that TPI's undertaking extended beyond the Green Sheet is similarly broad.  Like the pharmacy in 
Frye
, TPI's undertaking was limited to the instructions it chose to provide.  And, like the pharmacy in 
Frye
, TPI offered a less-than-

comprehensive warning scheme, instead confining its comments to a more modest "guide". 

    The fact that some of the carpenters may have consulted the Green Sheet when installing the truss system does not change our conclusion.

In 
Blalock v. Syracuse Stamping Co.
, 584 F. Supp. 454 (E.D. Pa. 1984), a steel tube painting worker was injured when a flammable liquid leaked from a defective drum and ignited in an electrostatic painting area.  The worker sued his employer, and the employer impleaded its fire insurance company, alleging the insurer voluntarily undertook inspections, but performed them negligently.  The insurer contended its inspections were not a voluntary undertaking creating a duty in favor of the employer.

The court asked whether the insurer's inspections constituted a voluntary undertaking.  
Blalock
, 584 F. Supp. at 456.  The court considered several factors: whether the insurer's safety recommendations were more than merely advisory; whether the insurer had power or authority to compel the employer to implement these recommendations; whether these recommendations were, in fact, implemented; whether the insurer had a legal or contractual duty to inspect; whether the insurer inspected the entire premises; and whether the employer had no responsibility to inspect.  
Blalock
, 584 F. Supp. at 456 (discussing 
Evans v. Liberty Mutual Insurance Co.
, 398 F.2d 665 (1968)).

The court found only one of these factors was present: the insurer's recommendations were implemented.  
Blalock
, 584 F. Supp. at 456.  But the court held this factor alone did not establish a duty for the insurer: "It would disserve the public policy of protecting workers' safety to hold that a duty arises because safety recommendations were implemented."  
Blalock
, 584 F. Supp. at 456.

Like the insurer in 
Blalock
, TPI's instructions were advisory.  TPI could not force the carpenters to abide by its admittedly general instructions.  The fact that two of the five carpenters chose to follow these instructions does not subject TPI to liability it expressly disclaimed.  See 
Jackson v. Hilton Hotels Corp.
, 277 Ill. App. 3d 457, 467-68, 660 N.E.2d 222 (1995)(hotel did not voluntarily undertake to provide loading dockplate where dockplate was chained and locked).

CONCLUSION

   TPI owed no duty to the carpenters, and thus bears no contribution liability to Hines.  Summary judgment was appropriate, and we affirm.

Affirmed.

Burke, J., concurs.

Cahill, P.J., dissents.

PRESIDING JUSTICE CAHILL, dissenting:

I respectfully dissent.  This is a voluntary undertaking case.  The majority accurately and carefully sets out the law in Illinois that governs a voluntary undertaking. We disagree about the application of the law to the facts of this case.

 The Truss Plate Institute (TPI) was under no duty to publish and distribute "recommendations" for bracing wood trusses, but when they undertook to do so, TPI placed itself within the scope of section 324A of the Restatement (Restatement (Second) of Torts §324A (1965)).  The majority appears to adopt TPI's characterization of the Green Sheet, which uses words like "guide," "recommendations," "advisory," and "general instructions."  But when we examine the Green Sheet we confront a photographic reduction of an 18 page pamphlet of detailed written instructions and 18 engineering drawings that show you how to brace wood trusses while erecting a roof.  Anyone who has opened a box of unassembled bicycle parts on Christmas Eve and set about putting the parts together from the instructions and illustrations in the box will have a good idea of what the Green Sheet is: a blueprint for assembly of a complex mechanism.  The euphemisms used by TPI and borrowed by the majority to describe the document do not accurately describe the Green Sheet or what TPI undertook to do.  

The majority's argument that no duty is owed (even if the Green Sheet is an undertaking) because the relationship between TPI and the carpenters is remote and without oversight and control, is also unpersuasive.  The deposition of the managing director of TPI included admissions that the "mission" of TPI is "to maintain the *** industry on a sound engineering basis," and that the intended audience for the Green Sheet is truss installers in the field.  When those statements and the Green Sheet are measured in light of section 324A, the undertaking of a duty strikes me as clear.  

The majority's "narrow construction" argument based on 
Frye v. Medicare-Glaser Corp.
, 153 Ill. 2d 26, 605 N.E.2d 557 (1992), also strikes me as unpersuasive.  In 
Frye
, the pharmacist omitted a label from a prescription bottle.  The case can be distinguished.  Here, TPI undertook to draft and disseminate a precise method for trussing a wood roof, omitting nothing.  
Blalock v. Syracuse Stamping Co.
, 584 F. Supp. 454 (E.D. Pa. 1984) as an analogy for this case is far afield, remote, to borrow a word from the majority.  The injured third party in 
Blalock
 never saw or relied on the safety inspections of the insurer.  Here, the Green Sheet was placed in the hands of carpenters and TPI intended that its bracing "recommendations" be used in the field.  They were used, and as a result, it is alleged, part of the roof collapsed. 

Among the cases cited earlier in the opinion, I would only note that both 
Evenson v. Osmose Wood Preserving, Inc.
, 760 F. Supp. 1345 (S.D. Ind. 1990) and 
Klein v. Council of Chemical Associations
, 587 F. Supp. 213 (E.D. Pa. 1984), went out on summary judgment because the trade associations did not manufacture, distribute, design, or test the chemicals that caused the injury.  By contrast, the "product" in this case was not the assembled wood trusses, but the design for them contained in the Green Sheet.  As for 
FNS Mortgage Service Corp. v. Pacific General Group, Inc.
, 24 Cal. App. 4th 1564, 29 Cal. Rptr. 2d 916 (1994), which the majority cites, but discounts, it will come as no surprise that I believe it is the most soundly reasoned case in the majority opinion.  

Finally, the majority alludes, in passing, to a dispute about who was responsible for the outdated Green Sheet being in the hands of the carpenters, and to liability disclaimers in the Green Sheet.  As I read the record, these issues prompted material factual disputes, inappropriate for summary judgment.  

I would reverse summary judgment for TPI and remand this case for trial.