[No. C014392. Third Dist. May 12, 1994.]

FNS MORTGAGE SERVICE CORPORATION, Plaintiff and Appellant, v. PACIFIC GENERAL GROUP, INC., et al., Defendants, Cross-complainants, and Appellants; INTERNATIONAL ASSOCIATION OF PLUMBING AND MECHANICAL OFFICIALS, Defendant, Cross-defendant and Respondent.

## COUNSEL

Brown & Wood, Thomas G. Wood and David C. Powell for Plaintiff and Appellant.

Greve, Clifford, Diepenbrok & Paras, William L. Baker, Craig L. Scott, Steefel, Levitt & Weiss, Barry W. Lee and Donald P. Gagliardi for Defendants, Cross-complainants and Appellants.

Loeb & Loeb, Robin Meadow, Peter S. Selvin and Bert C. Cozart for Defendant, Cross-defendant and Respondent.

## OPINION

**BLEASE, Acting P. J.**—This is an appeal from a defendant's summary judgment in an action for damages caused by defective plastic plumbing pipe installed in a 384-unit apartment complex. We will reverse the summary judgment.

Plaintiff, FNS Mortgage Service Corporation, is a developer and owner of the apartment complex. Cross-complainants, Pacific General Group, Inc., and P.E. O'Hair & Co., are, respectively, the general contractor and the distributor of the defective pipe. Defendant and cross-defendant is the International Association of Plumbing and Mechanical Officials (IAPMO), a nonprofit association controlled by officials engaged in the enforcement of local plumbing codes.

IAPMO promotes uniformity in the plumbing trade through its Uniform Plumbing Code (UPC) and publishes a plumbing research directory which lists plumbing products that it has found to meet UPC standards. Virtually all public entities, including the City of Sacramento, have adopted the UPC. An unlisted pipe not bearing the UPC logo is unmarketable, as building

inspectors will not sanction its use. Plumbing wholesalers will not sell, and plumbers will not buy, such unlisted pipe.

The defective pipe was listed by IAPMO and stamped with IAPMO's federally registered mark, which certifies that the product has been approved by IAPMO as meeting uniform standards which it has promulgated.

The plaintiff and the cross-complainants, in pertinent part, seek to hold IAPMO liable on a theory of negligence. The trial court entered summary judgment for IAPMO on grounds that it owes them no duty because it is a nonprofit organization and because its activities are in the nature of a governmental function.

We conclude, following Restatement Second of Torts section 324A, that because IAPMO has undertaken to inspect pipe for conformity with uniform standards which it has promulgated and which have been adopted by public entities as part of the uniform building code, and has undertaken to enforce the standards by delisting or withdrawal of certification or destruction of nonconforming pipe, IAPMO is liable to purchasers injured by nonconforming pipe as a result of its failure to exercise reasonable care in the performance of these undertakings.

### FACTS

IAPMO is a private, nonprofit corporation "formed for the purposes of promoting the interests of the science of plumbing and plumbing officials, and for the purpose of promoting the interests of all persons whose responsibility it is to interpret plumbing laws and practices to the public." It provides information about the science of plumbing, promulgates standards in plumbing technology and practice, promotes the adoption of a uniform plumbing code employing the standards, and works to educate the public and bring about cooperation among plumbing officials and those involved in the trade.

IAPMO promotes uniformity in the plumbing trade through its UPC and publishes a plumbing research directory which lists plumbing products, such as acrylonitrite-butadiene-styrene (ABS) drain, waste and vent (DWV) pipe, that it has found to meet UPC standards.

According to IAPMO's former executive director, IAPMO's purpose "is, and always has been, to assist state and local governmental entities in the development and enforcement of their plumbing codes." According to IAPMO's director of plumbing research programs, another of IAPMO's

purposes is "to protect the consumers of pipe products from products which do not meet [standards]." According to IAPMO's present executive director, the listing service is designed to save plumbing officials "the trouble of having to reinvent the wheel and certify the product themselves."

IAPMO has voting and nonvoting memberships. Public entity members and their employees (typically plumbing inspectors) are entitled to vote; nonvoting members include representatives of private industry, labor and consumers. IAPMO is controlled by public entities and their employees through its officers and directors, who must be active, voting members.

To list a product in the plumbing research directory a manufacturer must submit a sample to IAPMO for testing for conformity with UPC standards. The manufacturer must also enter into a listing agreement under which IAPMO agrees to list the product and the manufacturer agrees to make the product according to standard. The manufacturer must affix IAPMO's federally registered mark, the letters "UPC" within a shield, to each product made in accordance with the standard, which certifies that the product conforms to minimum IAPMO standards and specifications. Manufacturers may, and typically do, use the UPC logo on product cartons, containers and advertising to promote their products. The listing agreement recites that the listing is "a representation of [IAPMO] that the product has been found to meet applicable standards and the requirements of the Uniform Plumbing Code." The listing period is one year, during which time the manufacturer agrees to four unannounced inspections by IAPMO at the manufacturer's expense. In the present case, an amendment to the listing agreement with the manufacturer of the allegedly defective pipe called for unannounced monthly inspections and for more specific test requirements for quality control. This was apparently in response to a growing problem of manufacturers using substandard materials in ABS products. The failure of the manufacturer to comply with the terms of the listing agreement is cause for delisting the product.

IAPMO collects an annual fee from a manufacturer to defray the costs of listing a. product. In 1985, the listing fee for ABS DWV pipe was $522.50.

Virtually all public entities, including the City of Sacramento, have adopted the UPC. According to IAPMO's executive director, ABS DWV pipe must be listed with IAPMO to be installed in the State of California. An unlisted ABS DWV pipe not bearing the UPC logo is unmarketable, as building inspectors will not sanction its use. Plumbing wholesalers will not sell, and plumbers will not buy, unlisted ABS DWV pipe.

IAPMO recognizes the "marketplace or economic consequences" of product listing and exercises caution before imposing the "harsh sanction" of

delisting an allegedly substandard product and ordering the UPC logo removed. IAPMO's executive director said delisting "would be like a death penalty" for a manufacturer.

In 1984 and 1985, Centaur Manufacturing made ABS DWV pipe that IAPMO approved for listing. In September 1984, an internal IAPMO memo directed that Centaur's operation be inspected and its pipe tested "ASAP" because "it has been alleged that Centaur is using outside regrind." UPC standards require virgin material; outside regrind is reprocessed material, and use of it in ABS pipe is reason for delisting the product. A March 1985 inspection found that Centaur's ABS DWV pipe did not meet minimum specifications for dimension and it was discovered that Centaur was using reprocessed ABS material. IAPMO put a hold on the pipe and told Centaur to either destroy the pipe or remove the UPC logo in the presence of an IAPMO representative. In May 1985, IAPMO imposed on Centaur a 30-day suspension of use of the UPC logo on ABS DWV pipe that failed thickness and impact tests. That same month, IAPMO renewed for one year its listing agreement with Centaur for the same pipe. In November 1985, IAPMO delisted Centaur's ABS DWV pipe but only for Centaur's failure to pay outstanding inspection fees.

In April 1985, San Juan Group, a partnership composed of FNS Mortgage Service Corporation and the developers of an apartment complex, PGG Real Estate Investors, Ltd., entered into a general contract with Pacific General Group for the construction of Park City Apartments, a 384-unit apartment complex, in the City of Sacramento. Pacific General Group subcontracted with Pacific Plumbing & Heating Company for installation of the plumbing. The contract and subcontract, consistent with the City of Sacramento codes, required that plumbing systems meet UPC specifications. From May through July 1985, Pacific Plumbing & Heating purchased ABS DWV pipe from P.E. O'Hair & Company, a plumbing supply distributor. The pipe sold to Pacific Plumbing & Heating was manufactured by Centaur. It was listed with IAPMO and bore the UPC logo; had it not, it would not have been purchased and installed.

Subsequently, it is claimed, the pipe prematurely deteriorated and failed because it was manufactured improperly and contained substandard materials, causing substantial property damage. Centaur admitted during the course of this litigation that, as a cost-saving measure, it used nonvirgin, regrind material, "everything that was available," in the manufacture of its ABS pipe.

The owners and developers of the project, FNS Mortgage Service Corporation, PGG Real Estate Investors, and San Juan Group, sued, as pertinent

here, the general contractor, Pacific General Group, for strict product liability and negligence, the plumbing supply distributor, P.E. O'Hair, for strict product liability, negligence and negligent misrepresentation, and IAPMO for negligence and negligent misrepresentation. Pacific General Group cross-complained against IAPMO for negligence and equitable indemnity; P.E. O'Hair cross-complained against IAPMO for equitable indemnity.

The complaint and the cross-complaints against IAPMO allege that in listing and continuing to list the ABS pipe manufactured by Centaur that foreseeably would be relied upon by the plaintiffs and other defendants, IAPMO failed to use reasonable care in monitoring, inspecting and testing the pipe; that the pipe was defective; and that, had IAPMO exercised reasonable care, it would have discovered the defect and should have delisted the product.

IAPMO moved for summary judgment on the complaint and the cross-complaints. It contended, inter alia, that it is not liable for negligence because it had no duty to protect the plaintiffs and the cross-complainants from the risk of damage by defective pipe. For purposes of IAPMO's summary judgment motion, the allegations of negligent conduct were assumed to be true. The dispositive issue on which IAPMO sought summary judgment was whether, on the undisputed facts set out above, IAPMO's duty of due care ran to those who purchased and used the defective pipe.

The court granted IAPMO's motion and entered judgment for IAPMO on the complaint and the cross-complaints, concluding that policy considerations—the fact that IAPMO does not profit by its services, and the fact that IAPMO performs services in the nature of a governmental function—leave IAPMO unaccountable to the plaintiff and the cross-complainants for negligence.[1]

DISCUSSION

I

IAPMO contends that the summary judgment should be upheld based on the trial court's finding that it has no duty to avoid negligent conduct. IAPMO argues that under case law, e.g., *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], the issue of duty is governed by the balancing of policy considerations and that the

---

[1]Although recognizing that IAPMO performs functions for the benefit of public entities, the trial court rejected the notion that IAPMO is itself a de facto public entity and therefore entitled to governmental immunity. IAPMO has no quarrel on appeal with that determination.

balance in this case weighs against the existence of a duty of care. We disagree.

IAPMO's arguments begin and end with a discussion of the application of the policy considerations in *Rowland* to this case. However, the place to begin is at the beginning. ▮ *Rowland* begins its analysis with Civil Code section 1714: "Every one is responsible . . . for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person . . . ." (*Rowland* v. *Christian, supra,* 69 Cal.2d at pp. 111-112.) It then says:

"Although it is true that some exceptions have been made to the general principle that a person is liable for injuries caused by his failure to exercise reasonable care in the circumstances, it is clear that in the absence of statutory provision declaring an exception to the fundamental principle enunciated by section 1714 of the Civil Code, no such exception should be made unless clearly supported by public policy. [Citations.]

"A *departure* from this fundamental principle involves the balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]" (*Rowland* v. *Christian, supra,* 69 Cal.2d at pp. 112-113, italics added.)

At this point *Rowland* turns to an examination of the common law rule that excepted a possessor of land from liability for injuries to persons who had entered upon that land, the criticisms and erosion to which it had been subjected in the light of changes in the law and society, and the lack of a present relationship between the categories of the common law and the considerations pertinent to an exception from the prevailing rule of liability. (69 Cal.2d at pp. 113-118.)

This recapitulation reveals two significant omissions in IAPMO's argument. The first is its failure to recognize that it bears the burden of demonstrating that the exception from liability it seeks is "clearly supported by public policy." The second is its failure to recognize that the question of duty must be considered in light of the existing law, rather than as a novel abstraction in each case. (Also cf., e.g., *Andalon* v. *Superior Court* (1984)

162 Cal.App.3d 600, 610 [208 Cal.Rptr. 899]; *Merenda* v. *Superior Court* (1992) 3 Cal.App.4th 1, 8 [4 Cal.Rptr.2d 87].)

## II

██ The existing rule of liability pertinent to this case is set out in the Restatement Second of Torts section 324A (hereafter section 324A). "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

██ IAPMO has undertaken to render the service of inspecting pipe manufacturers and delisting those who are unwilling or unable to adhere to standards it has promulgated. It should recognize that these services are necessary for the protection of third persons, consumers who will acquire the pipe and install it in improvements to realty. Indeed, such protection is one of IAPMO's avowed purposes. IAPMO's failure to exercise reasonable care in its undertakings increases the risk of harm to such consumers from defective pipe that otherwise would have been removed from the stream of commerce. IAPMO arguably has undertaken to perform a duty owed by local building officials to consumers (albeit one for which the officials would be afforded statutory immunity). The consumers here suffered harm because of the reliance of local building officials upon IAPMO's undertakings. IAPMO is subject to liability to consumers under the principles of section 324A for physical harm resulting from its failure to exercise reasonable care in its undertakings.

These principles were relied upon in *Hempstead* v. *General Fire Extinguisher Corporation* (D.Del 1967) 269 F.Supp. 109 to hold Underwriters' Laboratories accountable for negligence in approving the design of a fire extinguisher. Underwriters operates in a manner remarkably similar to IAPMO—it is a nonprofit organization that provides services in fire, crime and casualty prevention. Among its activities is the establishment of minimum product standards and a listing service of products that meet the standards. Before listing a product, Underwriters tests it to determine whether it meets standards. If it passes, the product is listed in a publication, and the manufacturer is permitted to affix Underwriters' logo to products found to have met the standard. Underwriters may inspect operations of

manufacturers with listed products to insure product standards continue to be met. If deficiencies are found, they must be corrected or the Underwriters' logo removed from the product. (*Id.* at pp. 116-117.)

In *Hempstead,* much like this case, the local fire prevention code authorized public officials to rely upon the services of Underwriters to determine the suitability of a particular type of fire extinguisher, thus Underwriters' approval of the fire extinguisher "was unquestionably of aid to [the plaintiff] in selling . . . the extinguisher which exploded." (269 F.Supp. at p. 117.) *Hempstead* observed that, because of its testing and listing services, "[i]t is straining at words to say that Underwriters does not approve the design of a product. The design may originate with the manufacturer, but when Underwriters lists it, it thereby tacitly impresses its approval upon the design." (*Ibid.*)

A similar thread runs through *Hanberry* v. *Hearst Corp.* (1969) 276 Cal.App.2d 680 [81 Cal.Rptr. 519, 39 A.L.R.3d 173], although the opinion does not cite section 324A. *Hanberry* involved an injury caused by a defective product that carried Good Housekeeping magazine's seal of approval, a representation that the magazine is satisfied the product is a "good" one and not defective and on which the plaintiff relied in purchasing the product. The plaintiff sued Good Housekeeping's publisher, Hearst Corporation, for negligent misrepresentation. The trial court sustained Hearst's demurrer, and the Court of Appeal reversed, reasoning as follows. "Implicit in the seal and certification is the representation [Hearst] has taken reasonable steps to make an independent examination of the product endorsed, with some degree of expertise, and found it satisfactory. Since the very purpose of [Hearst]'s seal and certification is to induce consumers to purchase products so endorsed, it is foreseeable certain consumers will do so, relying upon [Hearst]'s representations concerning them, in some instances, even more than upon statements made by the retailer, manufacturer or distributor. [¶] Having voluntarily involved itself into the marketing process, having in effect loaned its reputation to promote and induce the sale of a given product, the question arises whether [Hearst] can escape liability for injury which results when the product is defective and not as represented by its endorsement. In voluntarily assuming this business relationship, we think [ ] Hearst has placed itself in the position where public policy imposes upon it the duty to use ordinary care in the issuance of its seal and certification of quality so that members of the consuming public who rely on its endorsement are not unreasonably exposed to the risk of harm." (*Id.* at p. 684.)

IAPMO seeks to distinguish *Hanberry* as a case involving an entity that endorsed a product for its own commercial gain, in contrast to IAPMO,

which realizes no profit from its listing service and lists products to facilitate the work of public officials. However, nonprofit status is not a basis for exemption from liability. "[B]y the great weight of authority, and clearly the rule in California, persons who are not recipients of the charity, such as employees and strangers, may maintain an action based on negligence." (*Edwards* v. *Hollywood Canteen* (1946) 27 Cal.2d 802, 812 [167 P.2d 729].) Although IAPMO does not profit by its enterprise, its activities are not wholly gratuitous—it collects a fee from the manufacturer of every product it lists.

IAPMO argues that, unlike *Hanberry*, IAPMO's logo is the *manufacturer*'s representation that it has agreed to manufacture the product to conform to UPC standards. Whatever the semantic merit of this claim, it has no bearing in this case as we look to *Hanberry* only for general support. The gravamen of the claim in the present case is IAPMO's negligence in failing to inspect or to take appropriate delisting action, and these omissions are clearly the conduct of IAPMO.

Nor do we find the fact that IAPMO is governed by public entities and governmental officials an appropriate basis for distinction. This would effectively confer on IAPMO governmental immunity, a legislative, not a judicial function. (See *Lopez* v. *Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 792-793 [221 Cal.Rptr. 840, 710 P.2d 907]; *Coppernoll* v. *Board of Directors* (1983) 138 Cal.App.3d 915, 918 [188 Cal.Rptr. 394].)

Unlike the hoary exception to liability in question in *Rowland* v. *Christian,* the rule of section 324A as reflected, inter alia, in *Hempstead* and *Hanberry,* has not been eroded by changed social circumstances, nor are we aware of any persuasive body of criticism of that principle. Accordingly, IAPMO bears a dual burden in this case in seeking an exception from the general rule of liability. It must overcome both the general rule and the weight of precedent which specifically supports the imposition of liability.

With these considerations in mind, we turn to the public policy arguments tendered by IAPMO.

### III

As related, IAPMO's arguments track the list of considerations pertinent to an exception from the usual rule of liability given in *Rowland* v. *Christian.* We respond seriatim.

The first consideration is the extent to which IAPMO's conduct was intended to affect the plaintiffs. IAPMO argues that the only intended users

of its listing service are public entities which require compliance with IAPMO standards. This is an evasion. The "end and aim" of IAPMO's undertakings is that the manufacture of the relevant building materials, according to safety and durability standards it has promulgated, benefits the consumers of the products. IAPMO's conduct is by this measure "intended to affect the plaintiff[s]." (See *Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358].)

The next consideration is the foreseeability of harm to the plaintiffs. IAPMO argues that, in the light of Centaur's ability to manufacture pipe properly, Centaur's promise in the listing agreement to do so, and the potential sanctions to Centaur for failure to comply, IAPMO could not have foreseen that Centaur would continue to manufacture and sell non-UPC pipe. But the very existence of the inspection and delisting scheme contemplates that unscrupulous manufacturers may breach their promise to manufacture pipe in accordance with the standards. Though the draconian nature of a penalty may deter recidivism it is flatly untenable to claim that one cannot foresee recidivism in light of the severe penalties that are prescribed for its occurrence.

The degree of certainty that the plaintiffs suffered harm is not in issue. If their allegations are proven they certainly have.

That brings us to the closeness of the connection between IAPMO's conduct and the damage suffered. IAPMO claims that it did not manufacture the substandard pipe, or have the power to prevent Centaur from doing so; nor did IAPMO affix the UPC logo to the substandard pipe. Therefore it cannot be said to have caused the plaintiffs' damage.

That is not the case. If IAPMO delists the product it will not be installed. If IAPMO should have delisted the substandard pipe here in issue and negligently failed to do so, its conduct was a cause of the damage suffered.

The next consideration is the moral blame attached to IAPMO's conduct. IAPMO claims "[i]t is impossible to attach any moral blame to its conduct, which [it says] evinces none of the features that one normally associates with moral culpability, such [as] dishonesty, malice, avarice, and the like" and suggests that its nonprofit status confers morality upon its conduct. IAPMO's list of normal moral considerations is conveniently elliptical. It would contract tort law to cases of intentional and outrageous conduct. It is enough to say that where a sufficient likelihood of harm to another attends a failure to perform an undertaking, sloth or timidity can be characterized as immoral. As to IAPMO's beneficent purposes, good ends do not render moral any means of attaining them.

IAPMO's next argument addresses conjointly the consideration of the policy of preventing future harm and the truncated consideration of consequences to the community of imposing potential for liability. IAPMO argues that the public will be harmed if it owes a duty of due care to purchasers and users of listed products because that would force IAPMO to discontinue its listing service, with the consequence that dishonest or incompetent manufacturers would be free to enter the market with substandard products. This argument only has application to the latter of the two fused considerations. As to the prevention of future harm, it is enough to say that the policy is advanced by a rule that induces competent inspection and enforcement of delisting where appropriate.

We discern no unusual or peculiar burden on IAPMO in recognizing an ordinary duty of due care. IAPMO asserts that the imposition of liability would cause it to withdraw entirely from the field of inspection and certification of manufactured products subject to its standards. The assertion is predicated on the claim that IAPMO "does not have the financial ability to guarantee the quality of products it lists." The claim is vastly overblown; the imposition of liability for negligence for the conduct in this case does not entail a guarantee of products that IAPMO lists, only that it reasonably perform the tasks it has undertaken.

In any event, we are chary of indulging a conclusionary, self-serving assertion of this nature by a litigant, unsupported by appropriate fiscal evidence, especially in the context of a summary judgment motion. We note that while IAPMO may have limited direct resources of its own, no reason appears why it could not pass on to the manufacturers this aspect of the costs of the service it provides as it already does with other such costs.

The final consideration is the availability, cost, and prevalence of insurance for the risk involved. IAPMO candidly admits "[t]here was no substantive evidence on this subject." It nonetheless asserts that in light of the large number of products which it lists "[p]lainly, it would be prohibitively expensive, if not impossible, for IAPMO to obtain enough insurance to allow it to be the guarantor of the quality of each and every product bearing the UPC label." This argument rests on a hollow reed. The liability in issue is far from equivalent to such a guarantee. In the absence of evidence we cannot conclude that this consideration weighs in favor of IAPMO.

A review of the considerations pertinent to duty listed in *Rowland* v. *Christian* affords no significant support for IAPMO's claim for exemption from the ordinary rule of liability for negligent conduct. In light of this, and in light of the precedents which support the imposition of a duty of care in

the circumstances alleged in this case, the summary judgment cannot be upheld.[2]

## DISPOSITION

The judgment is reversed. Plaintiff and cross-complainants shall recover their costs on appeal.

Nicholson, J., and Raye, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 11, 1994. George, J., was of the opinion that the petition should be granted.

---

[2]In light of this conclusion, we need not address the claims and arguments pertaining to other possible theories of liability presented, and we imply no view on these matters. IAPMO did move for summary adjudication of issues as an alternative to summary judgment. However, the matters as to which it sought summary adjudication were "that the specific issues enumerated in defendant's separate statement of undisputed facts, which is filed concurrently herewith, are established as being without substantial controversy." However, this is not a matter within the compass of summary adjudication of issues. (See Code Civ. Proc., § 437c, subd. (f).)