[No. G030301. Fourth Dist. Div. Three. Apr. 16, 2003.]

NAOMI DEKENS et al., Plaintiffs and Appellants, v.
UNDERWRITERS LABORATORIES INC., Defendant and Respondent.

## COUNSEL

Brayton Purcell, Alan R. Brayton, and Diane L. Abraham for Plaintiffs and Appellants.

Freeburg, Judy & Nettels, J. Lawrence Judy, Cynthia B. Schaldenbrand, Carla Lynn Crochet; Bell, Boyd & Lloyd and Francis J. Higgins for Defendant and Respondent.

## OPINION

**FYBEL, J.**—When Raymond Dekens died in 1999, he was suffering from cancer caused by exposure to asbestos. His heirs (plaintiffs) sued Underwriters Laboratories Inc. (U.L.) for wrongful death. They alleged that by testing small appliances and certifying them as safe, U.L. had undertaken to guarantee Mr. Dekens's safety from illness resulting from his exposure to asbestos while repairing those small appliances. The trial court granted U.L.'s motion for summary judgment.

Under the negligent undertaking doctrine (also known as the Good Samaritan doctrine), a defendant may be liable when it undertakes to render services necessary for another's protection, but negligently performs that

undertaking. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604 [76 Cal.Rptr.2d 479, 957 P.2d 1313]; Rest.2d Torts, § 324A.) U.L. met its burden on summary judgment by showing through admissible evidence that it never undertook to test small appliances for medical safety or to certify the appliances would not cause cancer. Plaintiffs failed to show a triable issue of material fact regarding the existence and scope of any such undertaking by U.L. The trial court properly granted summary judgment; therefore, we affirm.

### IDENTIFICATION OF PARTIES AND DESCRIPTION OF TRIAL COURT PROCEEDINGS

Mr. Dekens worked for more than 35 years repairing small appliances, some of which contained asbestos. Mr. Dekens died in 1999, suffering from mesothelioma, a form of cancer caused by exposure to asbestos. After Mr. Dekens's death, plaintiffs filed a complaint for wrongful death. Among the named defendants was U.L.

U.L. is a not-for-profit corporation engaged in standardization and testing activities. U.L.'s engineers test samples of small appliances submitted by manufacturers to determine whether the samples comply with U.L.'s engineering standards. These standards address such hazards as fire and electrical shock. If the samples meet U.L.'s engineering standards, the manufacturers may attach U.L.'s listing mark (the "UL" logo inside a circle) to the appliances in compliance with U.L.'s requirements.

U.L. moved for summary judgment. The trial court granted U.L.'s motion, stating, "U.L.'s role, in my observation—and there's no evidence to the contrary—focused on safety regarding electrical shock, heat, fire. Any issue involving asbestos dealt with insulation. They were not in the business of determining what levels of asbestos might cause a health hazard. . . . [¶] . . . [¶] . . . In other words, asbestos is referred to, and in more than one place in here, but it appears to me it's clear that U.L. is certifying the electrical safety and not assuming the responsibility of telling the consumer or anyone else that the product is safe or unsafe because of the existence of asbestos in its materials."

U.L. served a notice of entry of judgment attaching the order granting summary judgment. Plaintiffs appealed. No judgment appears in the record. "To preserve appellate jurisdiction, we will construe the order granting summary judgment as a judgment and plaintiffs' notice of appeal as being from that judgment." (*Massingill v. Department of Food & Agriculture* (2002) 102 Cal.App.4th 498, 503-504 [125 Cal.Rptr.2d 561].)

DISCUSSION

I.

*Standard of Review.*

■ "A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.] In the trial court, once a moving defendant has 'shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established,' the burden shifts to the plaintiff to show the existence of a triable issue; to meet that burden, the plaintiff 'may not rely upon the mere allegations or denials of its pleadings . . . but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' (Code Civ. Proc., § 437c, [former] subd. (*o*)(2) . . . .)" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476-477 [110 Cal.Rptr.2d 370, 28 P.3d 116].) "To speak broadly, all of the foregoing discussion of summary judgment law in this state, like that of its federal counterpart, may be reduced to, and justified by, a single proposition: If a party moving for summary judgment in any action . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 855 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

II.

*Negligent Undertaking Doctrine.*

■ California recognizes the negligent undertaking doctrine (also referred to as the Good Samaritan doctrine), which is contained in section 324A of the Restatement Second of Torts (section 324A). (*Artiglio v. Corning Inc., supra,* 18 Cal.4th 604, 607.) "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to

exercise reasonable care to [perform][1] his undertaking, if [¶] (a) his failure to exercise reasonable care increases the risk of such harm, or [¶] (b) he has undertaken to perform a duty owed by the other to the third person, or [¶] (c) the harm is suffered because of reliance of the other or the third person upon the undertaking." (§ 324A.)

" 'The foundational requirement of the good Samaritan rule is that in order for liability to be imposed upon the actor, he must specifically have undertaken to perform the task that he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative duty to perform that undertaking carefully.' " (*Artiglio v. Corning Inc., supra,* 18 Cal.4th at pp. 614-615.) Whether and to what extent U.L.'s testing and certification activities constitute an undertaking for purposes of section 324A is a legal question for the court to resolve. (*Artiglio,* at p. 615.)

■ Did U.L. undertake to provide services to Mr. Dekens and, if so, what was the scope of that undertaking? This is the foundational question and, as it turns out, the dispositive one in this case. The trial court found that U.L. never undertook to test or certify products as safe from asbestos, although the court did not use the word "undertaking." The trial court addressed this issue as follows: "U.L.'s role . . . focused on safety regarding electrical shock, heat, fire. . . . They were not in the business of determining what levels of asbestos might cause a health hazard. . . . [¶] . . . [¶] . . . U.L. is certifying the electrical safety and not assuming the responsibility of telling the consumer or anyone else that the product is safe or unsafe because of the existence of asbestos in its materials."

III.

*California Case Law Regarding the Negligent Undertaking Doctrine.*

Two cases establish the framework for our evaluation of the existence and scope of an undertaking under section 324A.

In *Artiglio v. Corning Inc., supra,* 18 Cal.4th 604, the Court of Appeal affirmed the grant of summary judgment in favor of Dow Chemical. The plaintiffs alleged damages as a result of leaking silicone breast implants. Among the defendants were Dow Corning, the manufacturer of the silicone implants, and Dow Chemical and Corning Inc., the entities that formed and owned Dow Corning. (*Id.* at p. 608.) Years before the development of the

---

[1]"The published text of section 324A uses 'protect' rather than 'perform.' Such was apparently a typographical error. [Citations.]" (*Artiglio v. Corning Inc., supra,* 18 Cal.4th 604, 613, fn. 4.)

implants, Dow Chemical conducted toxicology tests on silicone, and its scientists published an article reporting that silicone had a very low order of toxicity. (*Id.* at pp. 608-609.) Dow Chemical did not conduct any tests with respect to the safety of the actual implants manufactured or sold by Dow Corning. (*Id.* at p. 617.) All of the tests performed by Dow Chemical were conducted prior to the use of silicone in implants, and Dow Corning had had its own medical products division conduct more recent tests on the silicone implants. (*Id.* at pp. 616-617.)

Trademark agreements among Dow Corning, Dow Chemical, and Corning provided that Dow Chemical and Corning " 'controlled [Dow Corning's] operations, including the quality of its goods and services.' " (*Artiglio v. Corning Inc.*, *supra*, 18 Cal.4th at p. 610.) Under these agreements, Dow Chemical retained the right to inspect Dow Corning's manufacturing processes to assure product quality, and also retained the right to approve or disapprove products manufactured, distributed or sold using Dow Chemical's trademark. (*Ibid.*)

When Dow Corning applied to the Food and Drug Administration for approval of its silicone breast implants, its application "referenced hundreds of tests, including toxicological tests Dow Chemical had performed." (*Artiglio v. Corning Inc.*, *supra*, 18 Cal.4th at pp. 610-611.)

The California Supreme Court held these facts were insufficient to establish " 'an undertaking of such breadth and magnitude as to create a duty on the part of Dow Chemical to ensure the safety of all of Dow Corning's silicone products.' " (*Artiglio v. Corning Inc.*, *supra*, 18 Cal.4th at p. 617.) Because the facts did not establish an undertaking, the court did not consider the requirements of subdivisions (a), (b) and (c) of section 324A. (*Artiglio v. Corning Inc.*, *supra*, 18 Cal.4th at p. 618.)

In *FNS Mortgage Service Corp. v. Pacific General Group, Inc.* (1994) 24 Cal.App.4th 1564 [29 Cal.Rptr.2d 916], the Court of Appeal reversed a grant of summary judgment in favor of the defendant on the basis of the negligent undertaking doctrine. The defendant, International Association of Plumbing and Mechanical Officials (IAPMO), was a private, nonprofit corporation that promulgated the Uniform Plumbing Code (UPC) and published a directory of plumbing products it found to meet UPC standards. (*Id.* at pp. 1566-1567.) To be listed in IAPMO's product directory, a manufacturer had to (1) provide a sample for testing to determine its conformity with UPC standards, and (2) enter a listing agreement under which IAPMO agreed to list the product in its directory and the manufacturer agreed to make the product according to the UPC standards. (*Id.* at p. 1568.) Products approved by the

IAPMO bore a UPC logo; all other products were essentially unmarketable because building inspectors would not approve their use. (*Id.* at pp. 1568-1569.)

Centaur Manufacturing made a plastic plumbing pipe that was approved for listing by IAPMO in 1984 and 1985. (*FNS Mortgage Service Corp. v. Pacific General Group, Inc., supra,* 24 Cal.App.4th at p. 1569.) After listing the pipe, IAPMO discovered that the pipe had not, in fact, been manufactured to UPC standards. (*Ibid.*) The pipe was not delisted, however, until November 1985—14 months after the possibility the pipe was not manufactured to UPC standards was brought to IAPMO's attention, and eight months after testing proved this fact to be true. (*Ibid.*) Ultimately, the pipe was delisted for Centaur Manufacturing's failure to pay outstanding inspection fees and not for failure to meet UPC standards. (*Ibid.*)

In April 1985, the defective pipe, which was still listed with IAPMO and still bore the UPC logo, was purchased and installed in an apartment complex in Sacramento. (*FNS Mortgage Service Corp. v. Pacific General Group, Inc., supra,* 24 Cal.App.4th at p. 1569.) The construction contract required that the plumbing systems meet UPC specifications. (*Ibid.*) The pipe deteriorated prematurely, allegedly because it had been manufactured improperly and contained substandard materials, and caused substantial property damage. (*Ibid.*)

The Court of Appeal reversed the grant of summary judgment, finding that section 324A established an undertaking by IAPMO to the owners and developers of the apartment complex. "IAPMO has undertaken to render the service of inspecting pipe manufacturers and delisting those who are unwilling or unable to adhere to standards it has promulgated. It should recognize that these services are necessary for the protection of third persons, consumers who will acquire the pipe and install it in improvements to realty. Indeed, such protection is one of IAPMO's avowed purposes." (*FNS Mortgage Service Corp. v. Pacific General Group, Inc., supra,* 24 Cal.App.4th at p. 1572.)

## IV.

*Application of the Negligent Undertaking Doctrine in This Case.*

A. *U.L.'s evidentiary showing in support of motion for summary judgment.*

Was there an undertaking on the part of U.L. and, if so, was it broad enough to cover Mr. Dekens's injury? U.L.'s motion for summary judgment

was based on (1) the declaration of John Drengenberg, its manager of global consumer affairs, (2) a representative copy of the listing and follow-up service agreement U.L. enters into with manufacturers wishing to attach the U.L. logo to their products, (3) plaintiffs' supplemental and amended case report, (4) the superior court's general order regarding asbestos litigation, and (5) Mr. Dekens's deposition transcript.

U.L. met its burden of showing plaintiffs' claim had no merit. U.L. successfully showed the element of an undertaking by U.L. extending to medical risks of asbestos exposure from the products U.L. tested and certified as safe could not be established. Mr. Drengenberg's declaration stated that U.L.: tested and certified small appliances for safety from fire, electrical hazards, and accident hazards such as sharp or jagged edges; never manufactured, sold, or distributed any small appliances, asbestos, or consumer products containing asbestos; never tested or certified small appliances for medical risks associated with asbestos; never made a representation that any small appliance was safe with respect to asbestos fiber release or pulmonary health; and never provided advice concerning the medical risks of small appliances containing asbestos. Plaintiffs did not object to any of U.L.'s evidence.

This showing by U.L. shifted the burden to plaintiffs to show a triable issue of material fact as to the existence and scope of U.L.'s undertaking. (Code Civ. Proc., § 437c, subd. (p)(2).)

B.  *Plaintiffs' evidentiary showing opposing motion for summary judgment.*

Plaintiffs offered (1) deposition transcripts of U.L. employees, (2) a report of the Consumer Product Safety Commission (CPSC) listing hair dryers containing asbestos, (3) pages from a catalogue for West Bend coffee percolators bearing the U.L. logo, (4) pages from U.L.'s Internet Web site, and (5) transcripts from a congressional hearing on the danger of asbestos in handheld hair dryers. We address each of plaintiffs' arguments in turn.

First, the deposition testimony of two U.L. employees does not, as plaintiffs argue, show a triable issue as to whether U.L. tested or certified the medical safety of consumer products containing asbestos. One of the employees testified that certain U.L. standards permitted the use of unimpregnated asbestos as conductor insulation in microwave ovens unless the asbestos would be exposed to moisture produced by the appliances. This employee did not testify that U.L. tested microwave ovens for health hazards due to inhalation of asbestos used as conductor insulation. The other employee testified U.L. certified power cords using asbestos insulation, but he

was not aware of any testing by U.L. regarding whether asbestos fibers could be released from the products.

Second, the CPSC report does not show a triable issue of material fact. At most, it confirms U.L. never manufactured any hair dryers containing asbestos.

Third, the pages from a West Bend catalogue show that the pictures of various percolators were accompanied by the U.L. logo, indicating the percolator in question met U.L.'s safety standards. Nothing about the catalogue relates to the scope of U.L.'s undertaking.

Fourth, the pages from U.L.'s Web site reference U.L.'s product testing for "public safety" and refer to U.L. as a "conformity assessment provider[]." These references do not constitute an undertaking by U.L. to ensure medical safety from asbestos.

Fifth, plaintiffs relied on the testimony provided by U.L. at a congressional hearing in 1979. The purpose of that hearing, as expressed by the Chairman of the House subcommittee, was "to obtain a progress report from the Consumer Product Safety Commission regarding exactly what they are doing to curb the use of cancer-causing asbestos in consumer products, but most especially in handheld hair dryers." (The Question of the Life and Health Threatening Danger of Asbestos in Hand-held Hair Dryers, Hearing before House Com. on Interstate and Foreign Commerce, Subcom. on Consumer Protection and Finance, 96th Cong., 1st Sess., at p. 1 (1979) (1979 Hearing).)

Contrary to plaintiffs' arguments, the testimony at the congressional hearing makes clear that U.L.'s testing and certification process was intended only to prevent hazards such as fire, electrical shock, and injuries from sharp protruding objects. U.L.'s representatives testified U.L. would perform studies on hair dryers made without asbestos to make sure the material used in place of asbestos did not cause other problems, e.g., causing the plastic to melt. A written statement included in the Congressional Record emphasized that U.L.'s construction requirements for hair dryers are "designed to reduce the risk of electrical shock, fire, burns and personal injury due to accidental contact with moving parts or sharp edges." (1979 Hearing, *supra*, at p. 64, written statement of Robert W. Seelbach for U.L.) U.L. performs "engineering evaluations" (*id.* at p. 59, testimony of Henry Collins) and informs manufacturers what standard of performance is required for specific products and what materials meet that standard.

The testimony of U.L.'s representatives at the 1979 hearing shows that U.L. never tested or provided certification for the medical risks of asbestos. The testimony was as follows: "Evaluation of health hazards is an evolving medical science. Determination of long term effects on health by chemicals and other products requires special expertise and funding as evidenced by the establishment of specific federal agencies to pursue studies of these problems. [¶] UL is guided by and depends upon various sources and particularly on those government agencies having expertise and responsibility for identification of physiological hazards. Requirements in UL standards take cognizance of Food and Drug Administration regulations concerning proper levels of lead in paint for toys. Similar dependence is placed on the Bureau of Radiological Health for permissible radiation levels from products such as microwave ovens. [¶] Although UL has no basis for concluding that the use of asbestos in hair dryers constitutes a hazard, we gave consideration to the development of a standardized test procedure to determine whether, and to what extent, asbestos particles would be released during use of a hair dryer. Such a test method would appear to be feasible. The problem, however, is to assess the results of such a test in relation to a potential health hazard. [¶] We concluded that rather than dealing with this complex and possibly uncertain determination, UL would propose to prohibit use of asbestos which may be discharged from hair dryers, since it has been demonstrated that it is technologically feasible to design hair dryers without this form of insulation." (1979 Hearing, *supra*, at pp. 65-66, written statement of Robert W. Seelbach for U.L.)

Representatives of U.L. further testified at the hearing that U.L. did not conduct medical research, including research on the toxicity of asbestos. "[M]edical knowledge is not something which Underwriters' Laboratories has in-house. We do in fact have to depend on others for medical knowledge. [¶] . . . [¶] . . . We either say that [a product] is listed, in which case we indicate we have investigated it for all foreseeable hazards, cut fingers, et cetera, or if we don't do that, we classify them. We say we have investigated and reviewed this product for the following hazards. In the case of hazards that are beyond our capability—and toxicity is one of them—we use a disclaimer, indicating that we have not looked into toxic effects of this product." (1979 Hearing, *supra*, at p. 67, testimony of Robert W. Seelbach and Henry Collins.) At one point, U.L.'s representative testified about "seeing the results of CPSC's first investigation of asbestos hazards." (*Id.* at p. 57, testimony of Henry Collins.)

Plaintiffs failed to raise a triable issue of material fact showing U.L. undertook the responsibility to guarantee Mr. Dekens's safety from cancer-causing asbestos through its process of testing and certifying small appliances as safe from injury due to fire, electrical shock, or injuries from sharp

protruding objects. Therefore, the trial court properly granted summary judgment in favor of U.L.

C. *Legal authority cited by plaintiffs.*

The cases cited by plaintiffs are distinguishable. In *Hampstead v. General Fire Extinguisher Corp.* (D.Del. 1967) 269 F.Supp. 109, a federal district court denied U.L.'s motion for summary judgment in a case alleging negligence in the testing and certification of fire extinguishers. The plaintiff was putting out a fire when he was injured by an exploding fire extinguisher. (*Id.* at p. 110.) U.L. had tested the fire extinguisher and determined it met U.L.'s safety standards. (*Id.* at p. 117.) The court found U.L. was liable under section 324A, subdivision (a), because U.L. had undertaken to determine the safety of the fire extinguisher and had increased the risk of harm to the user of the fire extinguisher by failing to fulfill its undertaking with reasonable care. (*Hampstead,* at p. 118.) Additionally, the local fire prevention code provided that the local official charged with specifying suitable fire extinguishing equipment was entitled to rely on U.L. in making that determination. (*Id.* at p. 117.) Therefore, U.L. had undertaken to ensure public safety with regard to the fire extinguishers, and the prevention of exploding fire extinguishers was within its undertaking. In contrast, the harm in the present case was not the result of the failure of the small appliances to meet the safety standards for which U.L. tested and certified them, but due to medical hazards for which U.L. did not test or certify.

In *Hanberry v. Hearst Corp.* (1969) 276 Cal.App.2d 680 [81 Cal.Rptr. 519, 39 A.L.R.3d 173], the plaintiff purchased a pair of shoes bearing the Good Housekeeping seal of approval. (*Id.* at p. 682.) The shoes were alleged to be defective in manufacture and design, in that the soles were exceptionally slippery, causing the plaintiff to fall on a smooth vinyl floor and injure herself. (*Ibid.*) The appellate court reversed the trial court's order sustaining the demurrer of Good Housekeeping's publisher to a claim for negligent misrepresentation. (*Id.* at p. 688.)

*Hanberry v. Hearst Corp., supra,* 276 Cal.App.2d 680 differs from the present case in several important ways. First, that court was considering a dismissal following a demurrer, while here we are considering a judgment following an order granting summary judgment where evidence was presented. Second, the claim in *Hanberry v. Hearst* was for negligent misrepresentation, rather than a negligent undertaking under section 324A. Third, the alleged defect in the shoes manifested itself in walking in the shoes. The negligent misrepresentation was that the shoes would be appropriate for that very purpose. Here, there was no undertaking—much less a representation—by U.L. that it tested the appliances for medical safety or certified they

would not cause cancer. Finally, Good Housekeeping had endorsed the shoes "for [its] own economic gain, and for the purpose of encouraging and inducing the public to buy [them]." (*Hanberry*, at p. 683.) There is nothing in the record before us that indicates U.L. permits manufacturers to use the U.L. logo for U.L.'s economic gain.

## V.

*Section 324A, subdivisions (a), (b), and (c).*

The foundational question—whether U.L. undertook to test for and certify safety from medical risks of asbestos—has been answered in the negative. Therefore, we do not reach the other questions—whether U.L. negated the requirements of section 324A, subdivisions (a), (b), and (c).

### DISPOSITION

The judgment is affirmed. In the interests of justice, neither party shall recover costs incurred in this appeal.

Sills, P. J., and O'Leary, J., concurred.