NOTICE
Decision filed 09/05/14,
corrected 09/11/14. The text of
this decision may be changed
or corrected prior to the filing of
a Petition for Rehearing or the
disposition of the same.

2014 IL App (5th) 130207

NO. 5-13-0207

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| JANICE SHERER, Individually and as | ) | Appeal from the |
| Administrator of the Estate of Sara Sherer Ott, | ) | Circuit Court of |
| Deceased, | ) | Montgomery County. |
| | ) | |
|     Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 05-L-5 |
| | ) | |
| JAY SARMA, | ) | |
| | ) | |
|     Defendant-Appellee | ) | |
| | ) | |
| (Jacob Ott, Montgomery County Mental | ) | |
| Health Department, Martha Benning, and | ) | Honorable |
| Psychiatric Associates of Central Illinois, | ) | Allan F. Lolie, |
| Defendants). | ) | Judge, presiding. |

_____

JUSTICE SCHWARM delivered the judgment of the court, with opinion.
Presiding Justice Welch and Justice Chapman concurred in the judgment and opinion.

**OPINION**

¶ 1    In the circuit court of Montgomery County, the plaintiff, Janice Sherer, individually and as administrator of the estate of her deceased daughter, Sara Sherer Ott, brought wrongful death and survival actions against the defendant, Jay Sarma, M.D., alleging that Sarma had been negligent in her care and treatment of Sara and Sara's

1

husband, Jacob Ott. The plaintiff appeals from the circuit court's order granting Sarma's motion for summary judgment on all counts against her. For the reasons that follow, we affirm.

¶ 2 BACKGROUND

¶ 3 Defendant Sarma is a psychiatrist licensed to practice in Illinois. In 2003, her employment with Psychiatric Associates of Central Illinois included providing services to patients of the Montgomery County Mental Health Department in Hillsboro (the health department). Jacob and Sara were two of Sarma's patients.

¶ 4 In 1997, when Jacob was a teenager, he began experiencing delusions and auditory hallucinations and was admitted to a psychiatric hospital in Springfield. During his hospitalization, Jacob was diagnosed with paranoid schizophrenia and depression, and he was violent until his schizophrenia was stabilized with Clozaril. He was also prescribed Zoloft for his depression. Following his hospitalization, Jacob was treated and medicated by a psychiatrist in Springfield until August 2003, when he and Sara married and his care was transferred to the health department.

¶ 5 On September 9, 2003, Jacob saw Sarma for the first time. Jacob also met with his assigned case manager, Martha Benning. Sarma noted that Jacob was doing well and that he and Sara had recently gotten married and were looking for an apartment. Jacob advised that he was stable on his medications, and he denied experiencing hallucinations or psychotic symptoms. The agreed treatment plan for Jacob was that he continue taking his prescribed medications and return in three months.

¶ 6 On December 9, 2003, Jacob saw Sarma and Benning again. Benning noted that

2

Jacob was in a good mood, and he denied having any psychotic symptoms. Jacob indicated that he was compliant with his prescribed medications. Jacob further indicated that he was happy in his marriage. Sarma noted that Jacob had seemed preoccupied, but he reported that he was doing well. Sarma recommended that Jacob continue taking Clozaril and Zoloft.

¶ 7 On December 24 or 25, 2003, Jacob became upset about a gift of money that his father had given Sara for Christmas. Jacob subsequently took the money after telling Sara that she could not keep it.

¶ 8 On January 4, 2004, Jacob and Sara went to the plaintiff's house, and Jacob confronted the plaintiff about her attempts to convince Sara to move back home with her. Jacob was angry and aggressive and wanted to fight the plaintiff. The plaintiff called Jacob's father during the encounter, but Jacob and Sara left before his father arrived. Thereafter, Jacob's family started checking up on him several times a day.

¶ 9 On January 6, 2004, Jacob's mother called Benning at the health department and advised that Jacob had stopped taking his prescribed medications. She further advised that he had not been making threatening statements and that she did not believe that he was a danger to himself or others. Benning told Jacob's mother that he needed to restart his medications immediately and that voluntary hospitalization was an available option.

¶ 10 On January 7, 2004, Jacob's mother took him to see Dr. Doug Byers in Springfield. Byers was told that Jacob had stopped taking his Clozaril as prescribed. Jacob made no threats and had not presented himself as a danger to anyone. Jacob told Byers that he had decreased his Clozaril intake to one pill a day because the medicine

3

made him feel sluggish and affected his hearing. Jacob admitted, however, that he was now more irritable, was not sleeping very well, and was not "getting along very well." Jacob agreed to increase his Clozaril intake until he could meet with Dr. Sarma again.

¶ 11 On January 8, 2004, Jacob and Sara attended a scheduled appointment at the health department. The plaintiff was initially present, but Jacob ordered her away, stating that the "problem" was between him and Sara. Minutes later, Sara left the appointment crying, and Sara indicated that Jacob had told her to leave. When Jacob met with Benning the same day, he told her that he had been off of his medications for four to six weeks but had restarted taking his Clozaril the previous night. Jacob reported that he was irritable and could not be around people. Benning noted that Jacob was psychotic and very fixed on his delusional beliefs, but he was neither aggressive nor combative. Jacob never threatened to harm Sara or anyone else, and Benning did not believe that he was a danger to himself or others. Dr. Sarma was not at the health department that day, and no one advised her that Jacob had stopped taking his Clozaril. Benning noted that Jacob had an appointment to see Sarma the following week. On the evening of January 8, 2004, Jacob and Sara went to Jacob's mother's house for dinner and then went back to their apartment.

¶ 12 On the morning of January 9, 2004, Sara went to the plaintiff's house to borrow some laundry detergent and then returned home. Jacob's mother stopped by the couple's apartment at least twice that day to make sure that Jacob was still taking his Clozaril and things were "pleasant and normal between Jacob and Sara." That night, the plaintiff and her husband went to the apartment to check on Sara, and Jacob's father and stepmother

4

were there, too. Jacob and Sara seemed fine. Hours later, Jacob stabbed Sara to death. The following week, Sarma learned what had happened.

¶ 13    On January 6, 2005, the plaintiff filed her initial complaint setting forth her wrongful death and survival actions arising from Sara's murder. Sarma was named one of the numerous defendants in the cause, and six amended complaints followed. The plaintiff filed her sixth amended complaint on September 17, 2008. In counts I, II, III, IV, V, VI, and IX of her sixth amended complaint, the plaintiff collectively alleged, among other things, that Sarma had been negligent in her treatment of Sara by failing to warn her of the threat that Jacob posed and that Sarma had also been negligent in her treatment of Jacob.

¶ 14    On November 16, 2012, Sarma filed a motion for summary judgment with a supporting memorandum. Sarma alleged that she was entitled to summary judgment on all of the plaintiff's counts against her because the plaintiff could not maintain a negligence action based on Jacob's physician-patient relationship and because there was no evidence that Jacob had ever made any specific threats that would give rise to a duty to warn Sara.

¶ 15    On December 18, 2012, the plaintiff filed a response to Sarma's motion for summary judgment with a supporting memorandum. The plaintiff maintained that because Sara and Jacob were both Sarma's patients, Sarma's treatment of Jacob was actionable by Sara, and Sara was not a "third party" for purposes of Sarma's duty to warn.

¶ 16    On February 6, 2013, the cause proceeded to a hearing on Sarma's motion for summary judgment. After both parties argued their respective positions, the circuit court

5

took the matter under advisement.

¶ 17    On February 8, 2013, the circuit court entered a written order granting Sarma's motion for summary judgment "with prejudice."  Citing *Eckhardt v. Kirts*, 179 Ill. App. 3d 863 (1989), the court held that because there was no evidence that Jacob had ever made any specific threats to harm Sara, Sarma had no duty to warn Sara that Jacob was a possible threat.  The court further held that the fact that Sara was also Sarma's patient did "not change the duty owed her" and that to expand Sarma's duty as the plaintiff suggested "would clearly be contrary to case law and public policy."  Following the circuit court's denial of her motion to reconsider, the plaintiff filed a timely notice of appeal.

¶ 18                                    ANALYSIS

¶ 19    "A motion for summary judgment should only be granted when the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 423 (1998).  "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt."  *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).  Our review of a circuit court's order granting summary judgment is *de novo*.  *Id.*

¶ 20    "To recover damages based upon negligence, a plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injury."  *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010).  "The existence of a duty under a particular set of circumstances is a question of law for the court to decide."  *Choate v. Indiana Harbor*

6

*Belt R.R. Co.*, 2012 IL 112948, ¶ 22. "Absent a duty, 'no recovery by the plaintiff is possible as a matter of law.' " *Id.* (quoting *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 411 (1991)).

¶ 21 When determining whether a legal duty exists, a court must "ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 436 (2006).

> "The 'relationship' referred to in this context acts as a shorthand description for the sum of four factors: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 18.

"Any analysis of the duty element turns on the policy considerations inherent in the above factors, and the weight accorded each of the factors depends on the circumstances of the particular case." *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 22.

¶ 22 In *Tarasoff v. Regents of the University of California*, 551 P.2d 334, 339-41 (Cal. 1976), after announcing his intention to do so in a therapeutic setting, the defendant doctors' patient killed a "readily identifiable" woman who had rejected his advances. When the victim's parents later sued the doctors for failing to warn the victim of the impending danger that the patient posed, the doctors maintained that they owed no duty to the victim, because she was not one of their patients. *Id.* at 340-42. Recognizing the

7

"public importance of safeguarding the confidential character of psychotherapeutic communication," the California Supreme Court nevertheless held that "the public policy favoring protection of the confidential character of patient-psychotherapist communications must yield to the extent to which disclosure is essential to avert danger to others." *Id.* at 346-47. The court thus determined that under the circumstances, the doctors had a duty to protect and warn the victim, even though she was not one of their patients. *Id.* at 347-51. The court explained:

"We realize that the open and confidential character of psychotherapeutic dialogue encourages patients to express threats of violence, few of which are ever executed. Certainly a therapist should not be encouraged routinely to reveal such threats; such disclosures could seriously disrupt the patient's relationship with his therapist and with the persons threatened. To the contrary, the therapist's obligations to his patient require that he not disclose a confidence unless such disclosure is necessary to avert danger to others, and even then that he do so discreetly, and in a fashion that would preserve the privacy of his patient to the fullest extent compatible with the prevention of the threatened danger." *Id.* at 347.

¶ 23 In *Renslow v. Mennonite Hospital*, 67 Ill. 2d 348, 349-50 (1977), a mother was given a blood transfusion that years later caused her daughter to be born with "permanent damage to various organs, her brain, and her nervous system." When the mother brought a negligence action against the hospital on behalf of herself and her daughter, the circuit court dismissed the portion of the complaint that sought damages for the daughter for failure to state a cause of action. *Id.* After noting that "[h]istorically, negligence could

8

not be founded upon the breach of a duty owed only to some person other than the plaintiff," our supreme court held that the daughter could seek damages for her injuries under a limited theory of transferred negligence. *Id.* at 355-57. The court thus found that under the circumstances, the hospital's duty of care to the mother extended to the daughter, because of the special relationship between the mother and daughter. *Id.*

¶ 24 In *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 514 (1987), the plaintiff, a passenger in a car driven by a medicated patient who had recently been released from the defendant hospital, was injured when the patient crashed the car into a tree. The plaintiff sought to recover damages from the hospital and two of its doctors for the injuries he sustained as a result of the accident, alleging that the patient should have been warned of the side effects of the medications the doctors had administered. *Id.* at 514-15. Stating that "[t]he transfer of duty is limited by a court's policy decision that the duty to act with reasonable care should be transferred to the third-party plaintiff," our supreme court affirmed the circuit court's dismissal of the plaintiff's claims, holding that "a plaintiff cannot maintain a medical malpractice action absent a direct physician-patient relationship between the doctor and plaintiff or a special relationship, as present in *Renslow*, between the patient and the plaintiff." *Id.* at 528, 531. The court explained that "[h]olding the hospital liable for all harmful acts committed by patients who have been released would be an unreasonable burden on the institution" and that as a matter of public policy, a hospital's duty to warn a patient of the dangers of using a prescribed drug should not be "extended to third-party nonpatients who have no patient-hospital relationship or a special relationship with a patient." *Id.* at 526-27. "Such a broad duty

9

extended to the general public would expand the physician's duty of care to an indeterminate class of potential plaintiffs." *Id.* at 532.

¶ 25 In *Estate of Johnson v. Condell Memorial Hospital*, 119 Ill. 2d 496, 499-500 (1988), an informally admitted psychiatric patient escaped from the defendant hospital and struck the plaintiff's decedent's car during an ensuing police chase. After the decedent died from her resulting injuries, the plaintiff filed wrongful death and survivor claims against the hospital, alleging, among other things, that the hospital "either knew or should have known that [the patient] suffered from mental disorders, drug addiction, and had a propensity toward violence and flight from authorities." *Id.* at 500. Noting that "[i]n general, one has no duty to control the conduct of another to prevent him from causing harm to a third party," our supreme court rejected the plaintiff's contention that the hospital owed a third-party duty to the decedent. *Id.* at 503-10. In reaching its conclusion, the court discussed and distinguished *Renslow*, stating that the plaintiff's reliance on that case was "misplaced." *Id.* at 509. The court also discussed *Kirk* and noted that in that case, it had "rejected the plaintiff's contention that the defendants' alleged failure to warn the patient of the drugs' side effects created a duty that extended to third-party nonpatients." *Id.*

¶ 26 In *Eckhardt*, 179 Ill. App. 3d at 864-65, after the defendant doctor's psychiatric patient shot and killed her husband, the plaintiff, the deceased husband's estate, filed a malpractice action alleging that the death was the result of the doctor's negligent treatment of the deceased's wife. The plaintiff's claims included an allegation that the doctor was negligent for failing to warn the couple of the attendant dangers of the wife's

10

mental health disabilities. *Id.* at 866. Arguing that the plaintiff could not establish that the defendant owed the deceased a duty of care, the defendant filed a motion for summary judgment, which the circuit court granted. *Id.* at 865-66. When affirming the circuit court's judgment, the appellate court discussed *Kirk* and *Condell* and further considered cases from other jurisdictions that had "concluded that a therapist cannot be held liable for injuries inflicted upon third persons absent specific threats to a readily identifiable victim." *Id.* at 871. The *Eckhardt* court also noted that the California Supreme Court had later explained that "*Tarasoff* involved an exception to the general rule that one owes no duty to control the conduct of another and that the therapist's duty to warn or protect another in *Tarasoff* arose because the decedent was the known, specifically foreseeable and identifiable victim of the patient's threats." *Id.* at 872. The *Eckhardt* court ultimately held as follows:

> "Based upon the prior discussion of the law, we believe the plaintiff must establish the following elements relating to the alleged duty owed in order to sustain her cause of action. First, the patient must make specific threat(s) of violence; second, the threat(s) must be directed at a specific and identified victim; and, third, a direct physician-patient relationship between the doctor and the plaintiff or a special relationship between the patient and the plaintiff." *Id.* at 872.

Finding that there was no evidence that the doctor's patient had "ever made specific threats of violence against her husband," the *Eckhardt* court determined that because the plaintiff had "failed to establish the first two elements of the duty to warn, the trial court properly granted summary judgment to the defendant." *Id.* at 873. In light of that

11

determination, the court declined to decide whether the plaintiff had established the existence of a " 'special relationship.' " *Id.* The *Eckhardt* court then stated that its disposition was consistent with the "sound public policy against expanding the liability of health professionals to an indeterminate class of potential plaintiffs" and that "[h]uman behavior is simply too unpredictable and the field of psychotherapy presently too inexact to require that therapists be ultimately responsible for all the actions of their patients." *Id.* at 873-74. "To impose such a responsibility without limit would be to place an unacceptably severe burden on those who provide mental health care to the people of this State, ultimately reducing the opportunities for needed care." *Id.* at 874.

¶ 27    In a special concurrence, Justice Reinhard opined that the *Eckhardt* majority should not have "adopted, in large part," *Tarasoff*'s duty-to-warn standard, because there was no need to do so in light of the supreme court's holding in *Kirk*. *Id.* at 874-75 (Reinhard, J., specially concurring). Applying *Kirk* to the facts at issue, Justice Reinhard noted that it was "clear that plaintiff's decedent had no direct physician-patient relationship with defendant" and that there was no "special relationship between the patient and the plaintiff's decedent, as was present in *Renslow*." *Id.* at 875. When discussing *Kirk*, Justice Reinhard further noted:

> "In deciding the scope of the duty of a physician in Illinois, the supreme court considered decisions in other jurisdictions, including cases with holdings similar to the approach used by the majority herein, which focus on whether the victim is a specifically identifiable potential victim, and rejected them." *Id.*

¶ 28    In *Doe v. McKay*, 183 Ill. 2d 272, 273-76 (1998), the plaintiff father sued the

defendant psychologist for the negligent treatment of his daughter after the daughter's therapy sessions with the defendant led to an accusation that the father had sexually abused the daughter "when she was about 11 years old." Noting that in the counts at issue, the father had not alleged that he had a therapist-patient relationship with the defendant psychologist, our supreme court held that pursuant to *Kirk*, the father could not sustain a cause of action based on the defendant's treatment of his daughter. *Id.* at 279 (citing *Eckhardt*, 179 Ill. App. 3d at 874-75 (Reinhard, J., specially concurring)). Declining to "apply *Renslow*'s concept of transferred negligence" to facts of the case, the court reiterated that "the duty of due care owed by a health care professional runs only to the patient, and not to third parties." *Id.* at 279-80. The court then explained that "[a] number of considerations relevant to the duty analysis strongly militate against imposition of a duty here, even when the asserted liability is characterized in terms of transferred negligence or a special relationship." *Id.* at 281-82. The court noted that expanding a therapist's duty of care to "nonpatient third parties" would result in "competing demands" and divided loyalties that could negatively affect the therapist's treatment decisions. *Id.* at 282. The *Doe* court observed:

"As one court has noted, '[D]octors should be free to recommend a course of treatment and act on the patient's response to the recommendation free from the possibility that someone other than the patient might complain in the future.' *Lindgren v. Moore*, 907 F. Supp. 1183, 1189 (N.D. Ill. 1995). Hoping to avoid liability to third parties, however, a therapist might instead find it necessary to deviate from the treatment the therapist would normally provide, to the patient's

13

ultimate detriment. This would exact an intolerably high price from the patient-therapist relationship and would be destructive of that relationship." *Id.*

The *Doe* court also recognized that expanding a therapist's duty of care to nonpatient third parties could negatively impact "the duty of confidentiality that every therapist owes to his or her patients." *Id.* The court noted that by statute, communications between a therapist and a patient are privileged and "subject to disclosure only in a limited range of circumstances." *Id.* at 283. The *Doe* court further noted that the United States Supreme Court had "recently underscored the importance of the psychotherapist privilege," quoting the following:

> " 'Effective psychotherapy *** depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.' *Jaffee v. Redmond*, 518 U.S. 1, 10, 135 L. Ed. 2d 337, 345, 116 S. Ct. 1923, 1928 (1996)." *Id.*

The *Doe* court thus observed that "[a]llowing a nonpatient's action against another person's therapist to go forward would seriously intrude on the relationship between therapist and patient, jeopardizing the confidentiality necessary for the relationship to flourish." *Id.* at 283-84. In conclusion, the court stated:

14

"The considerations we have just discussed–the problem of divided loyalties, and the strong public interest in maintaining the confidentiality of therapist-patient communications–argue strongly against imposing on therapists a duty of care toward nonpatients. Accordingly, we believe that the rule in *Kirk* [citation], barring malpractice actions by third parties must be applicable here and requires that no duty be extended to the plaintiff for psychic injuries allegedly arising from the therapist's treatment of [his daughter]. To be sure, the plaintiff may allege that he himself was a patient of [the therapist], and counts to that effect remain pending in the circuit court of Du Page County. They are not at issue in the present appeal, however." *Id.* at 284-85.

¶ 29 Lastly, in *Tedrick v. Community Resource Center, Inc.*, 235 Ill. 2d 155, 157-60 (2009), after the defendant health-care providers' patient killed his wife, the wife's representatives brought wrongful death and survivor actions alleging, among other things, that the defendants had been negligent in their care of the husband and had a duty to warn the decedent of his stated thoughts and threats of killing her. The circuit court dismissed with prejudice the plaintiffs' complaint for failing to allege a recognized legal duty or a special relationship that would allow for a transfer of negligence from the patient to his wife. *Id.* at 157, 177. When affirming the circuit court's judgment, the supreme court rejected the plaintiffs' arguments that the defendants could be held liable because a marital relationship is a "special relationship" for purposes of transferred negligence and because the defendants' voluntary undertakings "created a duty to protect [the patient's wife] irrespective of a patient-physician relationship or special relationship between the

15

patient and a third party." *Id.* at 162. With respect to the former argument, after noting that it had repeatedly limited *Renslow* to its particular facts, the court stated that a marriage relationship "is not comparable to the relationship between a mother and fetus." *Id.* at 177. With respect to the latter, having noted that there was no evidence that the decedent wife was also a patient of the defendants, the court held that the defendants did not owe the decedent a duty to warn her of her husband's violent propensities. *Id.* at 160, 172. The court stated that it was "not persuaded by plaintiffs' arguments that the long-established principles in *Kirk* and *Doe* should not be followed in this case." *Id.* at 172.

¶ 30 When determining that the defendants did not owe the decedent wife a duty to protect or warn, the *Tedrick* court noted that *Tarasoff* was the seminal case cited for the proposition that "a mental-health-care provider owes a duty to warn and protect a nonpatient third party, when his patient confides his intention to kill an identified third party and later kills the third party." *Id.* at 169-70. The court then discussed *Eckhardt* and stated, "[I]t is clear from a careful reading of *Eckhardt* [citation] and our opinion in *Doe* that this court had rejected the rationale of the *Tarasoff* case." *Id.* at 170. In a footnote, the court observed that the *Eckhardt* majority's three-elements test had been cited with approval in several appellate court decisions. *Id.* at 171 & n.4. The court also noted that in *Doe*, it had cited with approval Justice Reinhard's special concurrence for the proposition that "*Kirk* precludes recovery" in the absence of a physician-patient relationship. *Id.* at 172.

¶ 31 In the present case, the plaintiff contends that the circuit court should not have applied *Eckhardt*'s three-elements test when determining that Sarma had no duty to warn

16

Sara of the potential threat that Jacob posed to her safety. The plaintiff argues that because the victim in *Eckhardt* was not a patient of the defendant doctor, *Eckhardt* only implicated the "duty to warn a nonpatient third party." The plaintiff thus maintains that *Eckhardt*'s holding should be strictly limited to its facts. See *Doe*, 183 Ill. 2d at 289 (Harrison, J., dissenting) ("A cardinal principle of our common law system is that a holding can have no broader application than the facts of the case that gave rise to it."). Noting that our supreme court "has twice cited Justice Reinhard's concurrence in *Eckhardt* with approval for the proposition that Illinois law simply restricts claims against a physician to her patients and those persons sharing a special relationship with her patients," the plaintiff further suggests that *Eckhardt*'s specific-threat elements should be deemed nonprecedential "surplusage" that cannot control the outcome here. We disagree.

¶ 32    At the outset, we note that while the *Tedrick* court specifically stated that in *Doe*, it had cited Justice Reinhard's concurrence with approval, the *Tedrick* court arguably cited the *Eckhardt* majority's opinion with approval as well. See *Tedrick*, 235 Ill. 2d at 170-72. There was no need for the *Tedrick* court to consider or rely on the majority opinion, however, because *Kirk*, *Doe*, and Justice Reinhard's concurrence were dispositive of the third-party duty issue that the *Tedrick* court was asked to decide. *Id.* at 172. Additionally, the *Tedrick* court specifically noted that the *Eckhardt* majority's three-elements test had been cited with approval in several appellate court decisions (*id.* at 171 & n.4) and did not criticize the standard or suggest that it was unsound. The *Tedrick* court also stated that it had previously rejected the rationale of the *Tarasoff* case, but in context, the court was referring to *Tarasoff*'s extension of duty to nonpatient third parties,

17

as opposed to the specific-threat component adopted by the *Eckhardt* majority. *Id.* at 169-70; see also *Doe 1 v. North Central Behavioral Health Systems, Inc.*, 352 Ill. App. 3d 284, 290-91 (2004) (Holdridge, J., specially concurring). In any event, because our supreme court has not explicitly rejected or adopted the *Eckhardt* majority's three-elements test for determining a mental health professional's duty to warn or protect, the circuit court was bound by *Eckhardt* and the subsequent appellate court decisions that have cited it with approval. See *Delgado v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 481, 488 (2007) (noting that until our supreme court "says otherwise," circuit courts are bound by the decisions of the appellate court "regardless of the appellate court's district"). We further believe that *Eckhardt* is good law that provides a workable standard for mental health professionals and reflects the policy considerations and relationship factors upon which their legal duties are based.

¶ 33 As previously noted, in *Doe*, when discussing "the importance of the psychotherapist privilege," the supreme court recognized "the duty of confidentiality that every therapist owes to his or her patients" and the "limited range of circumstances" in which that duty may statutorily be breached. *Doe*, 183 Ill. 2d at 282-83. The *Doe* court further recognized that therapists should not be put in positions where "divided loyalties" might negatively affect a patient-therapist relationship or otherwise influence or compromise a particular course of treatment. *Id.* at 282, 284. In *Kirk*, the court observed that holding medical providers liable for all of the harmful acts of their patients would undoubtedly be "an unreasonable burden." *Kirk*, 117 Ill. 2d at 526. *Eckhardt*'s three-elements test addresses these duty considerations and further recognizes the

18

unforeseeable and "speculative nature of the risk of harm" posed by mental health patients. *Eckhardt*, 179 Ill. App. 3d at 873; see also *Peck v. Counseling Service of Addison County, Inc.*, 499 A.2d 422, 427 (Vt. 1985) (Billings, C.J., dissenting, joined by Peck, J.) ("It is scientifically recognized that it is impossible to predict future violent behavior."). We further note that *Eckhardt* was decided in February 1989, and effective September 1990, the General Assembly amended the Mental Health and Developmental Disabilities Confidentiality Act (the Act) (now see 740 ILCS 110/1 *et seq.* (West 2012)) to allow for the disclosure of privileged communications "when and to the extent, in the therapist's sole discretion, disclosure is necessary to warn or protect a specific individual against whom a recipient has made a specific threat of violence where there exists a therapist-recipient relationship or a special recipient-individual relationship" (Pub. Act 86-1417 (eff. Sept. 11, 1990) (amending Ill. Rev. Stat. 1989, ch. 91½, ¶ 811); now see 740 ILCS 110/11(viii) (West 2012)). Thus, to the extent that *Eckhardt*'s specific-threat elements might have arguably been *dicta* when the case was decided, they are now recognized public policy. See *A.B.A.T.E. of Illinois, Inc. v. Quinn*, 2011 IL 110611, ¶ 34 (noting that the policy of the state is established by its laws). Moreover, given that the Act mandates that all communications between a therapist and a patient "shall be confidential and shall not be disclosed except as provided in [the] Act" (740 ILCS 110/3(a) (West 2012)), we agree with Sarma's observation that she was "precluded from assuming the very duty [the] [p]laintiff would seek to impose."

¶ 34    To be sure, Sarma owed Jacob and Sara the same duty, *i.e.*, "the duty of confidentiality that every therapist owes to his or her patients." *Doe*, 183 Ill. 2d at 282.

19

The purpose of that duty is to foster " 'an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears,' " without fear that "competing demands" and divided loyalties might negatively affect the therapist's treatment decisions. *Id.* at 282-83 (quoting *Jaffee*, 518 U.S. at 10).

> "[A] psychiatrist's ability to help her patients
>
> > is completely dependent upon [the patients'] willingness and ability to talk freely. This makes it difficult if not impossible for [a psychiatrist] to function without being able to assure … patients of confidentiality and, indeed, privileged communication. Where there may be exceptions to this general rule ..., there is wide agreement that confidentiality is a *sine qua non* for successful psychiatric treatment." (Internal quotation marks omitted.) *Jaffee*, 518 U.S. at 10.

¶ 35 As previously noted, under *Eckhardt*'s three-elements test:

> "To sustain a cause of action predicated on a therapist's alleged duty to warn third parties of the potential violent acts of a patient, the plaintiff must demonstrate the following: (1) the patient made specific threats of violence, (2) the threats of violence were directed against a specific and readily identifiable victim, and (3) there is a direct physician-patient relationship between the defendant and the victim or a special relationship between the patient and the victim." *Doe 1*, 352 Ill. App. 3d at 290 (citing *Eckhardt*, 179 Ill. App. 3d at 872).

Here, the circuit court correctly concluded that although the plaintiff had satisfied the

20

third element given Sara's direct physician-patient relationship with Sarma, Sarma had no legal duty to protect or warn Sara because there was no evidence that Jacob had ever made any specific threats to harm her. The plaintiff argues that Sarma's liability should be extended beyond *Eckhardt*'s constraints, but as the circuit court observed, that Sara and Jacob were both Sarma's patients did "not change the duty owed" and that to expand Sarma's duty as the plaintiff suggests "would clearly be contrary to case law and public policy." What happened to Sara was tragic, but we cannot conclude that Sarma had a duty to protect and warn her under the circumstances. To do so "would exact an intolerably high price from the patient-therapist relationship and would be destructive of that relationship." *Doe*, 183 Ill. 2d at 282. We lastly note that the divided-loyalty concerns discussed in *Doe* would seem particularly significant with respect to health-care providers such as the health department, which often have many patients but few doctors.

¶ 36                               CONCLUSION

¶ 37    For the foregoing reasons, the circuit court's judgment granting Sarma's motion for summary judgment on all of the plaintiff's counts against her is hereby affirmed.


¶ 38    Affirmed.

21

2014 IL App (5th) 130207

NO. 5-13-0207

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

JANICE SHERER, Individually and as          )    Appeal from the
Administrator of the Estate of Sara Sherer Ott,   )    Circuit Court of
Deceased,                                    )    Montgomery County.
                                             )
     Plaintiff-Appellant,                   )
                                             )
v.                                           )    No. 05-L-5
                                             )
JAY SARMA,                                   )
                                             )
     Defendant-Appellee                     )
                                             )
(Jacob Ott, Montgomery County Mental         )
Health Department, Martha Benning, and       )    Honorable
Psychiatric Associates of Central Illinois,  )    Allan F. Lolie,
Defendants).                                 )    Judge, presiding.
_____

**Opinion Filed:**         September 5, 2014
_____

**Justices:**         Honorable S. Gene Schwarm, J.

                    Honorable Thomas M. Welch, P.J., and
                    Honorable Melissa A. Chapman, J.,
                    Concur
_____

**Attorneys**     Kenneth James Hogan, Kenneth James Hogan, P.C., 311 East Main Street,
**for**          Suite 415, Galesburg, IL 61401; James C. Brandenburg, Brandenburg-Rees &
**Appellant**   Rees, 128 South Broad Street, P.O. Box 556, Carlinville, IL 62626-0556
_____

**Attorney**      Christian D. Biswell, Drake, Narup & Mead, P.C., 107 E. Allen Street, Suite
**for**          100, Springfield, IL 62704
**Appellee**
_____